78 N.J. Super. 485 (1963)
189 A.2d 448
GARDEN STATE PLAZA CORPORATION, A NEW JERSEY CORPORATION, PLAINTIFF-APPELLANT,
v.
S.S. KRESGE COMPANY, A MICHIGAN CORPORATION, AUTHORIZED TO TRANSACT BUSINESS IN NEW JERSEY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued December 3, 1962.
Decided March 21, 1963.
*488 Before Judges CONFORD, GAULKIN and KILKENNY.
Mr. Vincent P. Biunno argued the cause for appellant (Messrs. Lum, Biunno & Tompkins, attorneys).
Mr. Howard Stern argued the cause for respondent (Messrs. Shavick, Thevos & Schotz, and Mr. Joel J. Steiger, attorneys).
The opinion of the court was delivered by CONFORD, S.J.A.D.
Here again we face the problem of distinguishing between the proper application of the parol evidence rule and of the principle of admissibility of extrinsic circumstances to aid in the construction of an integrated written contract. See Atlantic Northern Airlines, Inc. v. Schwimmer, 12 N.J. 293, 302, 303 (1953); Harker v. McKissock, 12 N.J. 310 (1953). Contrast the emphasis in the first of these opinions on the factor of the search for meaning and intent with that in the second on the jural exclusiveness of the consensual integration. Both opinions were delivered on the same day by the same justice for a unanimous court.
The instant case poses the added question, one of first impression in this State, as to the enforceability of an express contractual provision precluding use of "previous negotiations, *489 arrangements, agreements and understandings * * * between the parties * * * to interpret or construe" the contract. (Section 17.23 of the lease)
This litigation arises from a dispute over the proper construction of the terms of a lease for certain store premises in a shopping center in Paramus owned by plaintiff (Garden State, hereinafter), demised to defendant (Kresge, hereinafter) by written lease executed May 11, 1956 for a term of approximately 25 years. The rented premises comprise about 16,000 square feet of floor space on the mall (main) level of the building and about 15,000 square feet of space below the mall level. The controversy involves section 4.3 and rider section 4.3(a), by which the tenant was obligated, over and above the stipulated rental for the leased premises, to pay a "Common Area charge," principally to compensate the lessor for maintenance of parking areas.
Section 4.3 provides that the common area charge for each fiscal year of the lease shall be the tenant's prorata share of the landlord's actual gross costs of maintaining the common areas, such share being fixed at "that proportion of the whole which the Floor Space in the Demised Premises bears to all Floor Space occupied during such period in the entire Shopping Center; in making such computation, (a) all Floor Space (including the Demised Premises) shall be weighted as follows: all such Floor Space on the mall level shall be weighted at one hundred per cent (100%) and all such Floor Space below or above the mall level shall be weighted at fifty per cent (50%); * * *."
No difficulty is presented as to the foregoing taken alone. The dispute arises from rider section 4.3(a), designed to set a maximum for the common area charge. It reads in pertinent part as follows:
"In the event that the areas of the mall level and lower level are substantially the same, the Landlord hereby agrees with the Tenant that the Common Area charge payable by Tenant as provided in Section 4.3 shall not exceed (i) the rate of twenty five cents (25¢) per square foot of Floor Space in the Demised Premises for each *490 Lease Fiscal Year during the first seven (7) Lease Fiscal Years, and (ii) thereafter the rate of three-eights (3/8) of one per cent (1%) of Gross Sales in any Lease Fiscal Year. If the Common Area charge provided in Section 4.3 is not paid by the Tenant because of the application of the above limitations, the Landlord shall have the right to carry forward any such underage and add the same to the Common Area charge for any future Lease Fiscal Year, so long as the total of such Common Area charge plus such underage does not exceed the limitation applicable to such Lease Fiscal Year. This procedure of carryover shall continue for the entire Demised Term."
Kresge takes the position that the 25-cent maximum rate fixed by section 4.3(a) for the first seven lease fiscal years is applicable only to floor space on mall level, and that as to floor space below mall level the provision for weighting at half the mall level rate is intended to become effective, by clear implication from section 4.3, to which section 4.3(a) is a rider. Under that view the maximum common area charge for below mall level space is 12 1/2 cents per square foot, not 25 cents. Garden State, on the other hand, argues that rider section 4.3(a) must be read literally, and as so read calls for a maximum rate of 25 cents for all floor space demised, at either level. It emphasizes that "Floor Space" is a specially defined term under article XVI, section 16.1 of the lease, declared therein to have the meaning, "the actual number of square feet of floor space * * * within the exterior faces of the walls surrounding all floors, basements, sidewalk subspaces, or parts of any thereof, with respect to the premises in question * * *" (with additional provisions for measurement to the center of walls or partitions in certain situations, and miscellaneous other refinements). Kresge responds that this definition is intended only to identify the metes and bounds dimensions of the premises demised and is irrelevant to the here litigated issue.
Garden State further argues that there is no sound reason for carrying the weighting concept of section 4.3 into section 4.3(a). It points out, among other things, that the weighting of floor space, under section 4.3, is relevant only to the distribution of the landlord's reimbursable common area *491 maintenance costs as between all the tenants at the shopping center, and not to the setting of a fixed maximum annual rate for any tenant individually.
The parties agree that the small variance between the areas of mall level and lower level floor space demised to Kresge is not sufficient to prevent operation of the condition of section 4.3(a) that the mall area and lower level be "substantially the same." Although it is realized that this stipulation was drafted at a time before the precise amount of space at each level to be taken by Kresge was known, neither party has been able to indicate to us any logically persuasive reason for the stipulation relevant to the problem of interpretation before us.
It is conceded that under plaintiff's contention the maximum common area charge for each of the first seven years of the term would be $7,786.38; under the defendant's, $5,913.51; being a difference of $1,872.86 per year, or $13,110.02 for the seven years.
At the trial before the Law Division judge sitting without a jury, Kresge offered in evidence two writings constituting a part of the negotiation process antecedent to the execution of the lease, and it also sought to adduce testimony of two of its officers in support of its version of the meaning of the disputed provision. All these offers were excluded upon objection by Garden State. The trial court gave two reasons for its ruling: (a) the exclusionary stipulation in section 17.23, and (b) the fact that the provisions in question were not ambiguous. Defendant had argued that section 17.23 was void as an attempt by the parties "to control the rules of evidence," and that the proffered proofs were admissible to aid in the interpretation of the contract.
Although excluding the evidence referred to, the court nevertheless found defendant's tendered hypothesis as to the true meaning of the provision for a maximum common area charge to be correct, and entered judgment in its favor.
While we do not propose in this opinion definitively to construe the lease, regarding the evidentiary posture of the case as not yet complete, as we shall explain, we do have substantial *492 doubts whether Kresge's position on the merits could be sustained without the aid of the extrinsic proofs here debated. It thus becomes essential that the court pass upon the issues of admissibility, both as a matter of contract and evidence law, generally, and in relation to the issue of the validity of the exclusionary clause of the lease.
The respective arguments advanced on this appeal and our disposition of them require a brief outline of the matters offered but denied admission in evidence.
The first item, marked exhibit D-1 for identification, is a writing entitled "Memorandum of Agreement," executed on behalf of the parties January 11, 1955 while the shopping center was in course of construction. It states at the outset: "The following business terms have been tentatively agreed upon between the Landlord and Tenant whereby the Tenant will lease from the Landlord a store premises in Building B of Garden State Plaza Regional Shopping Center." There then follow in outline form what purport to be the basic terms of the proposed lease in nine paragraphs, with the concluding clause: "The above terms are conditioned upon further agreement between the parties, upon the specific form and provisions of the lease and such additional business terms as have not been resolved." Paragraph 6 reads as follows:
"6. At the present time, and under present conditions, it is estimated Tenant's share for support of such things as, but not limited to, the automobile parking areas, public malls, public area other than malls and the public portion of the underground delivery system will amount to between 20¢ and 25¢ per square foot per year for the mall level area and 50% of said amount for basement space per square foot per year."
It appears from the colloquy at the hearing that a first draft of proposed lease was submitted by Garden State to Kresge February 15, 1955, and that on September 9, 1955 a revised draft of lease was submitted. These were not offered in evidence. Kresge then caused to be prepared and sent to Garden State a typewritten document entitled "Comments on Garden State Plaza Lease (Second Submission)." A copy *493 thereof, containing miscellaneous handwritten markings, notations and comments, was offered and marked exhibit D-2 for identification.
The original typed portion of this paper reads, under the heading "Section 4.3," as follows:
"In the fourth paragraph, note that the Tenant's pro rata share of the gross cost shall be based upon that proportion of the whole which the floor space in the demised premises bears to the space occupied during such period in the entire shopping center. What happens if part of the space is unoccupied?
In the fifth paragraph, it provides that all costs shall include expenses of all kinds and nature. This seems to be a blank check on which might be included extensive advertising and promotional schemes. There should be a definite ceiling on these parking lot charges.
In the Rider, it provides the first five years parking lot charge shall not exceed 25¢ per sq. ft. We have 15,770 sq. ft. on the mall level and the same in the basement, and according to Section 4.3 the basement is rated at 1/2 the mall level. Accordingly, this makes the

 mall level parking lot charge ........................ $3,942.50
 and the basement charge .............................. 1,971.25
 _________
 $5,913.75

After the five years are up, then the parking lot charge develops into 1/2 of 1% of the Gross Sales. This latter provision was not contemplated when the lease costs were being computed. It should be deleted and the charges maintained throughout the term of the lease at not more than 25¢ per sq. ft. with half price for the basement. Obviously the 1/2% tends to increase our rent factor 1/2 point.
* * *"
This document was apparently taken up for discussion at a conference of representatives of the parties in December 1955. Opposite the third paragraph of the typed excerpt is a handwritten notation, "Formula O.K." From pretrial depositions (not introduced in evidence) it appears that the handwriting is by Mr. Black, a representative of Kresge. However, it is not perfectly clear whether that notation was made at or subsequent to the conference, or communicated to any representative of Garden State. It also appears that a copy of the document kept by Garden State contains a written notation, "Reserved," alongside the same paragraph. These matters should be clarified at the retrial.
*494 The last documentary item offered by defendant was a telegram dated April 9, 1956 (marked D-3 for identification) from Mr. Chadwick, a Garden State negotiator, to Mr. Hollister, vice-president of Kresge, which Kresge claimed indicated that the points still open for discussion at that time did not include the subject of common area charges.
Kresge also sought to elicit testimony from Mr. Hollister that he wanted the weighted concept to apply to the maximum charge and that he understood the lease to have that effect; also, testimony from Mr. Black designed to show the intention of the parties in relation to the excluded documentary proofs. These offers were rejected, upon objection.
Kresge's initial brief on this appeal not only argued that the construction of the lease by the Law Division was correct on its face but that such result would have been fortified had the court admitted the proofs concerning prior negotiations outlined above. It argued the exclusion was improper.
At the argument we directed the parties to file supplemental briefs treating fully the question of admissibility of the evidence in question and also the validity of the exclusionary clause in section 17.23 of the lease. Such briefs have been submitted and considered.
We have concluded, for reasons to be stated, that the trial court erred in ruling out all of the proofs offered by Kresge and construing the lease without them; that sufficient basis for a reasonable difference of opinion as to its meaning existed to warrant admission of at least some of the proofs; and that the case should be retried so that the dispute of construction may be resolved on the basis of all of the evidence relevant thereto.

I.
Garden State makes the preliminary point in its supplemental brief that the supplemental issues we directed to be briefed are not properly before us on this appeal because Kresge's initial brief made no claim of error in either regard. *495 The facts are that the brief did argue that the extrinsic evidence was admissible and that Kresge did contest the validity of the exclusionary clause at the trial. We directed supplemental briefing of both questions in the discretionary exercise of our power to see to it that justice ultimately prevailed in this matter upon the applicable law and the competent proofs offered or available. Cf. In re Appeal of Howard D. Johnson Co., 36 N.J. 443, 445, 446 (1962). Kresge is not, as a result of our directive, put in the position of raising against its adversary any point it did not argue below. Rather is it in the position, having prevailed below, of now seeking to sustain the result it achieved in the Law Division on proper alternative grounds which it attempted to invoke at the trial should this court disagree, as we do, with the trial court's determination that the lease within its four corners unambiguously and conclusively dictates a construction in favor of Kresge's position. This it is entitled to do. "[A] respondent who is merely seeking to maintain his judgment may brief and argue on the appeal any points that will sustain his judgment." State v. LeFante, 14 N.J. 584, 589, 590 (1954). Cf. Hughes v. Eisner, 8 N.J. 228 (1951). That the initiative for appellate argument of one of the points is that of the court, motivated by the desire for attainment of a correct and just result, rather than of the party, is immaterial. We do not read any of the cases cited by Garden State to the contrary. In particular reference to the exclusionary clause of the lease, there is posed an issue of public policy in relation to the function of the judiciary which ought not to be bypassed where directly germane to the controversy before us.

II.
Garden State urges that admission of the excluded evidence would violate the parol evidence rule. We disagree, at least as to exhibits D-1 and D-2 for identification. As to D-3 for identification, we leave the question of admissibility to the trial court at the retrial, subject to the discussion of the law *496 herein, being uncertain of its materiality on the exiguous explanation given at the trial.
We are entirely clear that the parol evidence rule applies only to prevent the substantive alteration of contractual terms agreed upon by parties and expressed in an integration of their bargain, by resort to other prior or contemporaneous agreements or understandings. But the parol evidence rule does not even come into play until it is first determined what the true agreement of the parties is  i.e., what they meant by what they wrote down. Only when that is determined is one in an appropriate position to raise the bar of the parol evidence rule to prevent alteration or impugnment of the agreement by the asserted contradictory prior or contemporaneous agreement. In other words, interpretation and construction must necessarily precede protection against forbidden contradiction or modification. And in the process of interpretation and construction of the integrated agreement all relevant evidence pointing to meaning is admissible because experience teaches that language is so poor an instrument for communication or expression of intent that ordinarily all surrounding circumstances and conditions must be examined before there is any trustworthy assurance of derivation of contractual intent, even by reasonable judges of ordinary intelligence, from any given set of words which the parties have committed to paper as their contract. Construing a contract of debatable meaning by resort to surrounding and antecedent circumstances and negotiations for light as to the meaning of the words used is never a violation of the parol evidence rule. And debatability of meaning is not always discernible at the first reading of a contract by a new mind. More often it becomes manifest upon exposure of the specific disputed interpretations in the light of the attendant circumstances.
The foregoing is fundamental doctrine. See 4 Williston, Contracts (3d ed. 1961), § 600, p. 277; § 601, p. 303; § 609, p. 402; § 629, pp. 923-925; § 630, p. 925 et seq.; § 631, p. 948 et seq.; 3 Corbin, Contracts (1960), c. 24, passim, p. 2 *497 et seq.; c. 26, passim, p. 356 et seq. (the astute and realistic analysis of problems in this field by Professor Corbin has had particular influence on our courts in recent years); Morgan, Basic Problems of Evidence (1962), pp. 396-421; Atlantic Northern Airlines, Inc. v. Schwimmer, supra, 12 N.J. 293; Casriel v. King, 2 N.J. 45 (1949); Bedrock Foundations Inc. v. Geo. H. Brewster & Son, Inc., 31 N.J. 124 (1959); George M. Brewster & Son v. Catalytic Const. Co., 17 N.J. 20, 28 (1954); Meserve v. Traverso, 119 N.J.L. 566 (E. & A. 1938); Journal Plaza Holding Co. v. J.H.L. Co., 107 N.J. Eq. 14 (E. & A. 1930); Schnakenberg v. Gibraltar Savings & Loan Ass'n, 37 N.J. Super. 150 (App. Div. 1955); Deerhurst Estates v. Meadow Homes, Inc., 64 N.J. Super. 134, 149 (App. Div. 1960).
The rationale of the distinction between the use of evidence of extrinsic circumstances to illuminate the meaning of a written contract, which is proper, and the forbidden use of parol evidence to vary or contradict the acknowledged terms of an integrated contract, is set forth in the Schwimmer case, supra, 12 N.J., at p. 302, as follows:
"The `parol evidence rule' is a rule of substantive law not related to interpretation or the admission of evidence for the purpose of interpretation. Oral testimony of facts relevant to meaning are not within that principle. Parol evidence cannot be said `to vary or contradict a writing until by process of interpretation it is determined what the writing means. * * * Such testimony does not vary or contradict the written words; it determines that which cannot be varied or contradicted.' Corbin on Contracts, section 579. The `parol evidence rule' purports to exclude testimony `only when it is offered for the purpose of "varying or contradicting" the terms of an "integrated" contract; it does not purport to exclude evidence offered for the purpose of interpreting and giving a meaning to those terms. The terms of any contract must be given a meaning by interpretation before it can be determined whether an attempt is being made to "vary or contradict" them.' Ibid. sections 536, 543."
Of course, in order to justify the use of evidence of extrinsic circumstances to establish a contended-for interpretation of disputed contractual language, that interpretation must be one "which the written words will bear." Deerhurst Estates *498 v. Meadow Homes, Inc., supra, 64 N.J. Super., at p. 149. As stated in the Restatement of Contracts (1932), § 242, comment, p. 342, "Previous negotiations cannot give to an integrated agreement a meaning completely alien to anything its words can possibly express." Cases where the court either expressly or by clear implication found the integrated expression so indisputably clear as not to be susceptible of modification by the particular extrinsic circumstances relied upon, without violation of the parol evidence rule, are Harker v. McKissock, supra, 12 N.J., at p. 322 and Adams v. Jersey Central Power & Light Co., 21 N.J. 8 (1956).
We are satisfied that it can fairly be said that Kresge's version of the meaning of section 4.3(a) of the lease, when taken and read with section 4.3, is one "which the written words will bear," although, as already indicated, we do not necessarily entertain the view that such would be the natural or logical interpretation in the absence of the evidence afforded by the preliminary negotiations here, or that the final outcome of this case will vindicate that position.
Particularly pertinent to the present case is the subordinate interpretive principle that "usually the meaning that will be given to expressions used in a contractual transaction is the meaning that one of the parties in good faith gave to them, if the other party knew or had reason to know that he gave it. The meaning so adopted by the court should be reasonably `plain and clear' after all the relevant evidence is in." 3 Corbin, op. cit., supra, § 533, pp. 6, 7. Approval of a similar concept is found in George M. Brewster & Son v. Catalytic Const. Co., supra, 17 N.J., at p. 28, also quoting Corbin, and in Deerhurst Estates v. Meadow Homes, Inc., supra, 64 N.J. Super., at p. 153. It is at least arguable that the memorandum of agreement of January 18, 1955 and the conference of the parties over Kresge's written comments on the second submission of draft lease warrant an inference of knowledge by Garden State both that Kresge was expecting to pay in the neighborhood of half of 25 cents per square foot of lower level space, or half the mall level rate, in respect of *499 the common area charge, and that Kresge signed the lease understanding it to so provide in effect.
Garden State's supplemental brief advances a number of factual arguments to refute the asserted probative effect of the documents mentioned. We need not pause to consider them now since we are not going to decide this case on the merits at the present juncture. Suffice it to say that the contentions go to weight, not competency, and that both sides will be at liberty to offer any further relevant evidence and argument at the retrial. Only after all such proofs are in will the lease be ripe for final construction.
Garden State makes a resourceful argument to the effect that while the introduction of extrinsic evidence may be justified in cases of "absolute necessity," as where there is a patent or latent ambiguity (e.g., a contract to sell "my farm in Hillside," the vendor owning two farms in Hillside), a rule admitting evidence of the negotiations merely for purposes of interpretation of an agreement deliberately composed by the parties as the integration of their bargain is mischievous as constituting a "back-door route * * * to let in anything and everything" in the guise of construction and thereby destroying the parol evidence rule. We can only answer that the necessity for skill and discrimination in the judicial administration of these rules is no reason for scuttling them. More obviously, the choice is not ours. It has been made for us by our courts of last resort. Repeatedly have our highest courts used negotiations antecedent to integration in arriving at and effectuating the specific intent of the parties, subject only to the caution that the construction adjudicated be compatible with the contractual language. Journal Plaza Holding Co. v. J.H.L. Co., supra, 107 N.J. Eq., at p. 16; Meserve v. Traverso, supra, 119 N.J.L. 566; Atlantic Northern Airlines v. Schwimmer, supra, 12 N.J., at pp. 303, 306; Deerhurst Estates v. Meadow Homes, Inc., supra, 64 N.J. Super., at p. 153.
Special note should be made of the question as to the admissibility of the proffered testimony of Mr. Hollister. As *500 indicated above, this would merely have been that his understanding of the effect of the common area charge provisions of the lease was as is contended for by Kresge. It was not indicated that he communicated that understanding to anyone in the Garden State organization. As we read Kresge's supplemental brief, however, it concedes such evidence is inadmissible. It states: "Quite obviously if Mr. Black or Mr. Hollister made an uncommunicated notation in the confines of the Kresge office, that notation will have no probative value, and if all Kresge had to offer were such uncommunicated notations or comments, the evidence would be barred." This would apply a fortiori to the mere subjective impression of the meaning of the contract entertained by one of the parties. See 3 Corbin, op. cit., supra, § 579, pp. 427, 428; but see id., § 538, pp. 73-75.

III.
We have finally to deal with section 17.23 of the lease. In its entirety it reads as follows:
"There are no oral agreements between the parties hereto affecting this lease, and this lease supersedes and cancels any and all previous negotiations, arrangements, agreements and understandings, if any, between the parties hereto with respect to the subject matter thereof, and none thereof shall be used to interpret or construe this lease."
Short of the last clause, the stipulation is to all intents and purposes the equivalent of the parol evidence rule, and, for reasons already stated, does not militate against the conclusions arrived at earlier in this opinion. The last clause, however, if given effect, would obviously forbid using any of the materials of negotiation in construing the lease. In so doing it would seriously impair a basic adjudicatory tool with which courts attempt to do justice when called upon to construe a contract over the meaning of which its signatories argue different choices.
So-called "contracts to alter or waive the rules of evidence" have been discussed in a wide range of settings. 1 Wigmore, *501 Evidence (1940), § 7a, p. 213 et seq.; 6 Williston, Contracts (1938), § 1722, p. 4862; Note, 46 Harv. L. Rev. 138 (1932). Most of the cases have involved stipulations in insurance policies, which, though couched in terms of prerequisites of proof to establish entitling conditions or events, and frequently invalidated on purported principles of preclusion of ousting the court of jurisdiction or tampering with rules of evidence, are seen to rest more fundamentally on concepts of public policy hostile to harsh or unfair restrictions against recovery on such policies. See, e.g., Utter v. Travelers' Ins. Co., 65 Mich. 545, 32 N.W. 812, 816 (Sup. Ct. 1887); Stateman v. Travelers Casualty Ins. Co., 296 Ill. App. 5, 15 N.E.2d 607 (App. Ct. 1938); Haines v. Modern Woodmen of America, 189 Iowa 651, 178 N.W. 1010, 1015 (Sup. Ct. 1920); Hannon v. Grand Lodge, A.O.U.W. of Kansas, 99 Kan. 734, 163 P. 169, L.R.A. 1917C, 1029 (Sup. Ct. 1917); McCormick v. Woodmen of the World, 57 Cal. App. 568, 207 P. 943, 944 (App. Ct. 1922); Campbell v. Monumental Life Ins. Co., 34 N.E.2d 268, 274 (Ohio Ct. App. 1940); Mobile Fire Dept. Ins. Co. v. Coleman, 58 Ga. 251 (Sup. Ct. 1877). In one typical such case, American Ben. Life Ass'n v. Hall, 96 Ind. App. 498, 185 N.E. 344 (App. Ct. 1933), invalidating a stipulation that "total disability" could be evidenced only by proof of actual continuous confinement in a dwelling or hospital for at least two weeks and the necessary attendance of a doctor at least every three days, the court said, in language frequently cited and quoted (at p. 345 of 185 N.E.):
"* * * Courts for centuries have been gradually working to establish what evidence may be admissible under certain circumstances. For years the rule has been that any evidence relative to the issues and competent under the general rules of evidence is admissible in an action on an insurance policy. 14 R.C.L. 1438; 33 C.J. § 835.
If it were otherwise, there could be no settled rule of evidence and every contract would of necessity have to provide what rules of evidence could be used in any suit on such contract. It is far better for the courts to make the rules of evidence for all cases, as it is only by such method that any uniformity can be attained and any degree of certainty assured."
*502 It may well be questioned, however, whether the underlying philosophy of the holding is not really more one of abhorrence at the substantive unfairness of contractual conditions for recovery than at contracting for rules of evidence.
A significant approach in a case analogous to the instant problem may be found in Swift & Co. v. Hocking Valley R. Co., 243 U.S. 281, 37 S.Ct. 287, 61 L.Ed. 722 (1917). It illustrates the limits the courts will impose on recognition of unwarranted stipulations by parties in respect of the adjudicatory function. In that case it was material whether, for purposes of the right of a carrier to impose a demurrage charge on railroad cars, the track upon which they laid over was a private track of the shipper. The character of the track depended upon construction of a written agreement between the parties, but it was stipulated between them for purposes of the appeal that the track was private. The Supreme Court (per Brandeis, J.) held the stipulation void as contrary to the true fact, seemingly on its own motion. It said (at p. 289 of 37 S.Ct.):
"The construction and effect of a written instrument is a question of law. Dillon v. Barnard, 21 Wall. 430, 437, 22 L.Ed. 673, 676. Clearly the track in question was not a private track of the shipper, but a track of the carrier,  like the spur passed upon in National Ref. Co. v. St. Louis, I.M. & S.R. Co. 150 C.C.A. 361, 237 Fed. 347, affirming [D.C.] 226 Fed. 357.
If the stipulation is to be treated as an agreement concerning the legal effect of admitted facts, it is obviously inoperative; since the court cannot be controlled by agreement of counsel on a subsidiary question of law. See cases cited in the margin. If the stipulation is to be treated as an attempt to agree `for the purpose only of reviewing the judgment' below, that what are the facts shall be assumed not to be facts, a moot or fictitious case is presented. `The duty of this court, as of every judicial tribunal, is limited to determining rights of persons or of property, which are actually controverted in the particular case before it. * * * No stipulation of parties or counsel, whether in the case before the court or in any other case, can enlarge the power, or affect the duty, of the court in this regard.'"
Cf. Wheeler v. Barnes, 100 Conn. 57, 122 A. 912, 914 (Sup. Ct. Err. 1923).
*503 In his discussion of contracts to alter general rules of evidence Wigmore lists four categories. The third is applicable here:
"(C). It may exclude, for the other party, evidence which the usual law would admit; e.g., if a vendor should stipulate that no person not an expert should testify to the sold article's failure to equal sample; but no actual instance of this variety appears in the cases." 1 Wigmore, op. cit., supra, at p. 214 (emphasis by author).
The author states that there are "apparently not" any "reasons of policy" which would mark any of the listed categories as objectionable, excepting possibly the fourth, which would admit for the stipulating party evidence ordinarily inadmissible in law. A converse approach, however, is taken by the writer of the Harvard Law Review note cited above. He says:
"But if the parties resort to a judicial determination of their disputes, a contract to deprive the court of relevant testimony, or to restrict its judgment to a finding based upon incomplete facts, stands on a different ground than one admitting evidence that would otherwise have been barred by an exclusionary rule. One contract is an impediment to ascertaining the facts, the other aids in the final determination of the true situation. Differentiation upon this basis provides a desirable flexibility in dealing with the exclusionary rules of proof, yet safeguards the litigants by assuring a complete and adequate determination of the issues." (46 Harv. L. Rev., at pp 142, 143.)
We find the foregoing reasoning sound and persuasive as applied to the situation here presented. While plaintiff invokes the jurisdiction of the court to construe and enforce its contract, it would have us do so wearing judicial blinders. We are requested to conform to a private agreement mandating our performance of a judicial function in a manner which, under our precedents, is not the path to justice in arriving at the binding meaning of a contract. It would be wrong for us to do so. Confining our holding strictly to the situation before us, we hold that the relied upon portion of section 17.23 of the lease is void as against public policy. It consequently does not bar the admission of the proofs discussed above.
Reversed and remanded for a new trial conformably with this opinion.