15 A.3d 857

YA GLOBAL INVESTMENTS, L.P., PLAINTIFF–APPELLANT, v.
JULIANN HACKETT CLIFF AND PATRICK HACKETT,
JR., DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued November 16, 2010—Decided February 23, 2011.

2

4 

Before Judges WEFING, PAYNE and KOBLITZ.

*Mark S. Olinsky* argued the cause for appellant (*Sills Cummis & Gross,* attorneys; *Mr. Olinsky, James M. Hirschhorn,* and *Joshua N. Howley,* on the brief).

*Christopher L. Weiss* argued the cause for respondents (*Ferro Labella & Zucker,* attorneys; *Mr. Weiss,* of counsel; *Mr. Weiss* and *Russell T. Brown,* on the brief).

The opinion of the court was delivered by

WEFING, P.J.A.D.

Plaintiff, YA Global Investments, L.P. ("YA"), brought suit in Hudson County against defendants Juliann Hackett Cliff and Patrick Hackett, Jr. ("Hacketts") seeking to collect upon a personal guarantee. The Hacketts did not file an answer to the complaint but, rather, moved to dismiss for lack of personal jurisdiction. The trial court granted their motion, and YA has appealed. After reviewing the record in light of the contentions advanced on appeal, we affirm.

The Hacketts live in Ogdensburg, New York, a city located near the Canadian border. They owned and operated the Patrick Hackett Hardware Company ("PHHC"), headquartered in Ogdensburg and incorporated in New York State. PHHC ran a chain of retail hardware stores in northern New York State. Its customers were primarily residents of northern New York State and Canada. PHHC did not sell over the Internet and never solicited sales in New Jersey.

In the five-year period between 2001 and 2006, PHHC executed five promissory notes to a local bank, Community Bank, N.A., for a total of $2,730,000. On April 6, 2006, each of the Hacketts signed a "Commercial Loan Guaranty" under which they each became personal guarantors of all loans "previously, contemporaneously or hereafter granted" by Community Bank to PHHC. These guarantees covered all debts and obligations "whether arising from dealings between [the bank and PHHC] or from dealings by which [the bank] may become, in any manner whatever, a creditor of [PHHC]." They also included "all interest, fees, charges, attorney fees, and collection costs." The guarantees did not contain a forum selection clause but did specify that they were to be governed by New York law.

The following year, in May 2007, the Hacketts executed a stock purchase agreement under which they agreed to sell all of their shares in PHHC to Wisebuys Stores, Inc. ("Wisebuys"), a Delaware corporation that had its principal place of business in northern New York State. Wisebuys thereafter became a wholly-owned subsidiary of Seaway Valley Capital Corporation ("Seaway"), also a Delaware corporation with its principal place of business in northern New York State.

The sale of the Hacketts' PHHC stock to Wisebuys closed in November 2007. As part of the transaction the Hacketts obtained from Wisebuys a "Warranty Regarding Community Bank Debt" under which Wisebuys promised that by December 2007 the Hacketts would be released from their liabilities under the personal guarantees they executed in April 2006 in favor of Community

Bank. Wisebuys contracted to achieve this release in one of two ways: either by refinancing the notes the Hacketts had guaranteed or arranging for Community Bank to remove them from the guarantees.

Following the close of the stock purchase from the Hacketts, Seaway refinanced PHHC's debt with YA, a Cayman Islands investment fund headquartered in Jersey City, and it also borrowed additional monies from YA. On November 30, 2007, Seaway issued two secured convertible debentures to YA in exchange for $550,000. This transaction was guaranteed by Wisebuys and PHHC; Thomas Scozzafava, who served as the treasurer and chief financial officer of Wisebuys and chairman and chief financial officer of PHHC, executed the documents.

Several months later, on March 4, 2008, YA and Seaway entered into an Exchange Agreement, under which YA agreed to exchange the five promissory notes for a single secured convertible debenture for $2,249,073. The Hacketts contend that this transaction had the effect of releasing them from their earlier guarantees in accordance with Seaway's contractual obligation to secure their release while YA maintains that the Hacketts remain fully obligated. We are not called upon to resolve the substantive merits of that dispute in this appeal.

The day before the Exchange Agreement was executed, on March 3, 2008, Community Bank, the original holder of the notes and the accompanying guarantees, assigned them to plaintiff YA. The terms of the notes and guarantees permitted such assignment and stated that in the event of an assignment, any reference to "Lender" in the original documents, which had referred to Community Bank, would refer to the assignee.

In July 2009, Seaway and PHHC defaulted on the debenture. As a result of the acceleration clause in the debenture, the full balance, in excess of $2.7 million became due. In September 2009, YA demanded full payment from the Hacketts under their earlier guarantees to Community Bank that had been assigned to YA. When the Hacketts did not pay, YA filed suit in Hudson County,

alleging that the Hacketts breached their obligations under the guarantees. As we noted at the outset of this opinion, the trial court granted the Hacketts' motion to dismiss for lack of personal jurisdiction, and this appeal followed.

I

We note first the standard governing our review of this matter. The question whether a court has personal jurisdiction over a defendant is a question of law, and thus our review of the issue is de novo. *Mastondrea v. Occidental Hotels Mgmt., S.A.*, 391 *N.J.Super.* 261, 268, 918 *A.*2d 27 (App.Div.2007) (citations omitted). Our review, on the other hand, of any factual determinations a trial court may have made in connection with the question of jurisdiction focuses on whether those factual determinations are supported by substantial, credible evidence in the record. *Ibid.* (citations omitted).

II

New Jersey exercises long-arm jurisdiction over non-resident defendants to the extent "consistent with due process of law." *R.* 4:4–4(b)(1); *Avdel Corp. v. Mecure*, 58 *N.J.* 264, 268, 277 *A.*2d 207 (1971) (noting that New Jersey exercises its long-arm jurisdiction "to the uttermost limits permitted by the United States Constitution"); *Reliance Nat'l Ins. Co. in Liquidation v. Dana Transport, Inc.*, 376 *N.J.Super.* 537, 543, 871 *A.*2d 120 (App.Div. 2005). Due process requires only that the defendant have certain minimum contacts with New Jersey such that the maintenance of the suit here does not offend "traditional notions of fair play and substantial justice." *Reliance, supra,* 376 *N.J.Super.* at 543, 871 *A.*2d 120 (quoting *Int'l Shoe Co. v. Washington,* 326 *U.S.* 310, 316, 66 *S.Ct.* 154, 158, 90 *L.Ed.* 95, 102 (1945)); *accord Nicastro v. McIntryre Mach. Am., Ltd.,* 201 *N.J.* 48, 63, 987 *A.*2d 575 (2010).

The determination of whether a defendant has had sufficient "minimum contacts" with a state to warrant the exercise of

personal jurisdiction calls for a case-by-case analysis of a defendant's relationship with the proposed forum state. *Waste Mgmt., Inc. v. Admiral Ins. Co.,* 138 *N.J.* 106, 122, 649 *A.*2d 379 (1994) (citing *Charles Gendler & Co. v. Telecom Equip. Corp.,* 102 *N.J.* 460, 470, 508 *A.*2d 1127 (1986)). The first step in that analysis involves an examination of whether a defendant has "purposefully availed" himself of engaging in activities in that state, such that he should reasonably expect being haled into court there. *Waste Mgmt., supra,* 138 *N.J.* at 120–21, 649 *A.*2d 379. Such an examination is aimed at ensuring that a defendant will not be compelled to participate in litigation in a foreign jurisdiction "on the basis of random, fortuitous, or attenuated contacts or as a result of the unilateral activity of some other party." *Id.* at 121, 649 *A.*2d 379 (citing *Burger King Corp. v. Rudzewicz,* 471 *U.S.* 462, 475, 105 *S.Ct.* 2174, 2183, 85 *L.Ed.*2d 528, 542 (1985)).

The second step of the analysis is to consider "fair play and substantial justice," affording a defendant the opportunity to "make a 'compelling case' that some consideration makes the exercise of jurisdiction unreasonable." *Id.* at 124, 649 *A.*2d 379 (quoting *Burger King, supra,* 471 *U.S.* at 477, 105 *S.Ct.* at 2184, 85 *L.Ed.*2d at 544). Examples of such considerations include: "the burden on defendant, the interests of the forum state, the plaintiff's interest in obtaining relief, the interstate judicial system's interest in efficient resolution of disputes, and the shared interest of the states in furthering substantive social policies." *Id.* at 125, 649 *A.*2d 379 (citing *Lebel v. Everglades Marina, Inc.,* 115 *N.J.* 317, 328–29, 558 *A.*2d 1252 (1989)).

Personal jurisdiction is a "waiveable right," that is, a non-resident defendant may choose to consent to the jurisdiction of a particular court. *Burger King, supra,* 471 *U.S.* at 472 n. 14, 105 *S.Ct.* at 2182 n. 14, 85 *L.Ed.*2d at 540 n. 14. Forum-selection clauses, under which a party agrees in advance to submit to a particular jurisdiction in the event a dispute develops, are frequently used between commercial parties. They do not offend due process so long as the agreement is "freely negotiated" and the

provision is not "unreasonable and unjust." *Ibid.* (citing *M/S Bremen v. Zapata Off–Shore Co.,* 407 *U.S.* 1, 15, 92. *S.Ct.* 1907, 1916, 32 *L.Ed.*2d 513, 523 (1972)). Courts will enforce such a forum-selection clause unless it is the product of "fraud, undue influence, or overwhelming bargaining power," is unreasonable, or offends a "strong public policy." *M/S Bremen, supra,* 407 *U.S.* at 12–15, 92 *S.Ct.* at 1914–16, 32 *L.Ed.*2d at 521–23.

Here, YA did not contend that the Hacketts had sufficient minimum contacts with New Jersey as the basis for its claim that they were subject to suit in New Jersey. Rather, it relied upon the forum-selection clause in the Exchange Agreement, which selected New Jersey as the forum state. YA pointed to a sheet appended to the Exchange Agreement headed "Agreed and Acknowledged" that was signed by the Hacketts; it contended that this demonstrated that the Hacketts had voluntarily consented to be sued in New Jersey. The trial court rejected this contention, and we are satisfied that it was correct to do so.

The opening paragraph of the Exchange Agreement states that it is "by and among [Seaway] and [YA]." The body of the Exchange Agreement consistently implies that there are only two "parties" to the Agreement—Seaway and YA—by using the phrase "the other party," in the singular. The Exchange Agreement is "duly executed" only by Seaway and YA. The forum selection clause, contained in section 9(a) of the Exchange Agreement, provides

"[t]he *parties* further agree that any action between them shall be heard in Hudson County, New Jersey, and expressly consent to the jurisdiction and venue of the Superior Court of New Jersey, sitting in Hudson County ... for the adjudication of any civil action asserted pursuant to this Paragraph."

[ (Emphasis added.) ]

We agree with the conclusion of the trial court that the entire thrust of the Exchange Agreement is that there are only two parties to it, Seaway and YA, and its further conclusion that because the Hacketts were not parties to the Exchange Agreement, they are not bound by its forum-selection clause.

We reject plaintiff's contention that the trial court erred by not resolving all disputed material facts in its favor at this stage of the litigation. Plaintiffs did not present any evidence that supported its theory that the Hacketts were parties to the Exchange Agreement.

### III

We also reject plaintiff's further contention that the trial court erred by not affording it the opportunity to conduct discovery to search for extrinsic evidence that would support its position that the Hacketts were parties to the Exchange Agreement.

The primary standard governing the interpretation of an integrated agreement is to use "the meaning that would be ascribed to it by a reasonably intelligent person who was acquainted with all the operative usages and circumstances surrounding the making of the writing." *Deerhurst Estates v. Meadow Homes, Inc.*, 64 *N.J.Super.* 134, 149, 165 *A.*2d 543 (App.Div.1960) (citations omitted). "Semantics cannot be allowed to twist and distort [the words'] obvious meaning in the minds of the parties." *Conway v. 287 Corporate Ctr. Assocs.*, 187 *N.J.* 259, 269–70, 901 *A.*2d 341 (2006) (quoting *Atl. N. Airlines, Inc. v. Schwimmer*, 12 *N.J.* 293, 307, 96 *A.*2d 652 (1953)). But where the language used is susceptible to more than one reasonable construction, extrinsic evidence of the circumstances surrounding the contract may also be used to help interpret the meaning of a disputed contractual term. *Deerhurst Estates, supra*, 64 *N.J.Super.* at 149, 165 *A.*2d 543 (citations omitted).

There are, of course, limits on the use of extrinsic evidence as an interpretive aid for ambiguous language: the contended-for interpretation must be one "which the written words will bear." *Garden State Plaza Corp. v. S.S. Kresge Co.*, 78 *N.J.Super.* 485, 497, 189 *A.*2d 448 (App.Div.1963) (quoting *Deerhurst Estates, supra*, 64 *N.J.Super.* at 149, 165 *A.*2d 543). Such evidence, however, cannot be used "to alter an integrated written

document." *Conway, supra,* 187 *N.J.* at 268, 901 *A.*2d 341 (citing *Restatement (Second) of Contracts* § 213 (1981)).

New Jersey follows an expansive approach on the use of parol evidence.

Evidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. This is so even when the contract on its face is free from ambiguity. The polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded. The admission of evidence of extrinsic facts is not for the purpose of changing the writing, but to secure light by which to measure its actual significance. Such evidence is adducible only for the purpose of interpreting the writing—not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning of what has been said. So far as the evidence tends to show, not the meaning of the writing, but an intention wholly unexpressed in the writing, it is irrelevant. The judicial interpretive function is to consider what was written in the context of the circumstances under which it was written, and accord to the language a rational meaning in keeping with the expressed general purpose. [*Schwimmer, supra,* 12 *N.J.* at 301–02, 96 *A.*2d 652 (citation omitted).]

In sum, there is a "distinction between the use of evidence of extrinsic circumstances to illuminate the meaning of a written contract, which is proper, and the forbidden use of parol evidence to vary or contradict the acknowledged terms of an integrated contract." Garden State Plaza, *supra,* 78 *N.J.Super.* at 497, 189 *A.*2d 448.

We have recognized that in certain circumstances, it is appropriate for the parties to engage in "jurisdictional discovery" to learn whether a court does indeed have in personam jurisdiction over a defendant. *Maine v. SeKap, S.A. Greek Coop. Cigarette Mfg. Co., S.A.,* 392 *N.J.Super.* 227, 243, 920 *A.*2d 667 (App.Div. 2007). Such discovery, however, is typically warranted when the plaintiff seeks to discover facts to establish that a defendant has had sufficient contact with New Jersey to satisfy the requirement of due process. *Carroll v. United Airlines, Inc.,* 325 *N.J.Super.* 353, 367, 739 *A.*2d 442 (App.Div.1999); *Makopoulos v. Walt Disney World, Inc.,* 221 *N.J.Super.* 513, 518–19, 535 *A.*2d 26 (App.Div. 1987).

Here, plaintiff is not seeking to engage in "jurisdictional discovery" of such a nature. Rather, it seeks to undertake discovery into the merits of the underlying action, inquiring into exactly what the Hacketts were agreeing to and acknowledging when they signed the sheet appended to the Exchange Agreement, i.e., what were their intentions when they signed the sheet and were their guarantees extinguished as a result.

Here, plaintiff argues that it was entitled to broad discovery before the issue of personal jurisdiction could be decided because there is an intertwined factual issue going to the merits of the case as to what was intended when defendants "Agreed and Acknowledged" the Exchange Agreement and, therefore, as to who the "parties" to the agreement are for purposes of section 9(a). Plaintiff argues that the Exchange Agreement is susceptible to two reasonable interpretations: (1) that YA and Seaway are the only two parties to the agreement who consented to jurisdiction in New Jersey, as defendants contend; or (2) that by "agreeing and acknowledging" the agreement, defendants agreed to be bound by the forum-selection clause and thereby consented to jurisdiction in New Jersey, as plaintiff contends. Under defendants' view, they signed the agreement merely to acknowledge that the notes and their guarantees were being extinguished by the exchange. In plaintiff's view, the guarantees were not extinguished; rather, they were used as security for the debenture, and YA had defendants sign the agreement to make sure that any dispute regarding the debenture would be litigated in New Jersey.

YA's argument disregards, however, that the trial court did not need to hear extrinsic evidence in order to interpret the term "parties" as it is used in the Exchange Agreement. This is so because the meaning of the term is obvious, and YA's contended-for interpretation is not one "which the written words will bear." *Garden State Plaza, supra,* 78 *N.J.Super.* at 497, 189 *A.2d* 448. That is, the text of the Exchange Agreement clearly and consistently refers to YA and Seaway as the only two parties; the text cannot reasonably be read to include defendants as "parties" to

the agreement. It is only when language is susceptible to more than one reasonable interpretation that extrinsic evidence should be considered as an interpretative aid. *Deerhurst Estates, supra,* at 149, 165 A.2d 543. Otherwise, semantics should not be allowed to "twist and distort" the obvious meanings of contractual terms. *Conway, supra,* at 270, 901 A.2d 341.

Here, plaintiff has not offered any explanation as to how its interpretation of defendants as "parties" could possibly be consistent with the agreement as a whole without altering or contradicting its terms in multiple places throughout the agreement. Plaintiff has also not explained how defendants can reasonably be construed as "parties" along with Seaway and YA when defendants incurred no liabilities, assumed no obligations, and made no representations by signing the "Agreed and Acknowledged" page.

Regardless of how the factual disputes are ultimately resolved, the forum-selection clause is clear that only the two "parties" to the agreement were bound, and resorting to parol evidence to contradict that clear meaning would have been inappropriate.

We concur with the trial court's determination that the complaint YA filed in New Jersey should be dismissed. It is free to litigate its disputes with the Hacketts in the courts of New York State, which clearly have jurisdiction to resolve them.

The order under review is affirmed.