**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2242-20

MICHAEL K. FUREY and
NANCY H. FUREY,

     Plaintiffs-Appellants/
     Cross-Respondents,

v.

LEONARD BUCK TRUST,
GLENMEDE TRUST COMPANY,
NORMAN E. DONOHUE, II, and
ROBERT BARTLETT, as Trustees
of the LEONARD BUCK TRUST,

     Defendants-Respondents/
     Cross-Appellants.

_____

     Argued December 15, 2021 – Decided July 21, 2022

     Before Judges Sumners and Vernoia.

     On appeal from the Superior Court of New Jersey, Law
     Division, Somerset County, Docket No. L-0332-18.

     Michael K. Furey argued the cause for appellants/cross-
     respondents.

Craig S. Provorny and Timothy P. Malacrida argued the cause for respondents/cross-appellants (Kirmser, Lamastra, Cunningham & Skinner, attorneys; Craig S. Provorny, of counsel; Timothy P. Malacrida, on the briefs).

PER CURIAM

This matter turns on the interpretation of an agreement in which defendant Leonard Buck Trust (the Trust) assumed the obligation to remediate groundwater contamination on residential property it conveyed to plaintiffs Michael K. Furey and Nancy H. Furey in 1999. At the center of the dispute is the parties' disagreement over the parameters of the Trust's remediation obligations and whether the Trust and its trustees—defendants the Glenmede Trust Company, Norman E. Donohue, II, and Robert Bartlett— breached those obligations.

The trial court first granted partial summary judgment on defendants' counterclaim, finding the agreement allowed the Trust to seek a designation of the property as a classified exception area (CEA) from the New Jersey Department of Environmental Protection (NJDEP) without plaintiffs' consent. The court later granted defendants summary judgment dismissing plaintiffs' breach of contract and breach of the covenant of good faith and fair dealing claims, finding the Trust's groundwater remediation obligations are defined by

the agreement's unambiguous terms and the undisputed facts establish the Trust honored those obligations.

Plaintiffs appeal from those orders, arguing the court misinterpreted the agreement, erroneously concluded defendants are entitled to judgment as a matter of law, and the court erred by concluding the meaning of the agreement's terms should not be determined by the jury. Persuaded by plaintiffs' arguments, and because we are convinced a reasonable interpretation of the agreement supports plaintiffs' breach of contract and breach of the covenant of good faith and fair dealing claims, we reverse the summary judgment orders permitting the Trust to seek a CEA designation without plaintiffs' consent, dismissing plaintiffs' breach of contract and breach of the covenant of good faith and fair dealing claims, and directing plaintiffs to execute a remedial action plan (RAP) providing for a CEA designation and monitored natural attenuation (MNA) on the property.

Plaintiffs also appeal from orders dismissing their punitive damages claim and granting defendants summary judgment on their fraudulent inducement claim. Defendants cross-appeal from the court's denial of its motion for summary judgment on statute of limitations grounds. We affirm those orders.

3

I.

The motion court record is familiar to the parties and need not be restated at length here. That is because the orders challenged on appeal were decided primarily based on issues of contract interpretation, with the judges who entered the orders determining they could properly dispose of the motions by applying what they deemed to be the plain and unambiguous language of the agreement and without regard to extrinsic evidence.

On appeal, the parties principally focus their arguments on the meaning of the terms of the agreement. Defendants primarily argue the court properly granted the motions for summary judgment because the agreement plainly and unambiguously described their groundwater remediation obligations and the undisputed material facts established they complied with those obligations. In contrast, plaintiffs contend the court erred in its interpretation of the agreement, the Trust failed to honor its groundwater remediation obligations, and any dispute concerning the meaning of the agreement's terms should be decided by a jury.

We therefore confine our discussion of the summary judgment record to the facts directly pertinent to a resolution of the issues presented for disposition on appeal. In doing so, we review the orders de novo applying the same standard

4

as the trial court, recognizing summary judgment must be denied if "the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995); see also Townsend v. Pierre, 221 N.J. 36, 59 (2015); R. 4:46-2(c).

The Agreement

In 1998, plaintiffs entered into a contract to purchase residential property from the Trust for $1,400,000. Prior to the closing of title, an oil leak on the property resulted in the Trust's retention of an environmental contractor whose investigation revealed soil contamination from the oil leak and groundwater contamination that was attributed to two underground gasoline storage tanks that had been previously removed from the property.

Plaintiffs and the Trust, through their respective counsel, subsequently negotiated and entered into a Remediation Agreement (the agreement) detailing the parties' rights and responsibilities concerning the remediation of the soil and

groundwater contamination on the property.[1] Plaintiffs then proceeded with the purchase and closed title in 2000.

The agreement noted the investigation and remediation of environmental contamination on the property would not be complete prior to the closing of title. The agreement further provided that in consideration for plaintiffs' agreement to close title prior to the completion of the investigation and remediation of the soil and groundwater contamination on the property, the Trust agreed to assume environmental contamination remediation obligations. In pertinent part, in paragraph 2(a) of the agreement, the Trust agreed to:

> (l) [P]romptly, expeditiously, actively and without delay seek an unconditional No Further Action Letter and Covenant Not to Sue from the NJDEP for all soil issues associated with the two gasoline and one heating oil underground storage tanks and the caretaker's septic system now or formerly on the Property, any other soils contamination subsequently identified as a result of such investigations or remediation, either a conditional or unconditional No Further Action Letter and Covenant Not to Sue from NJDEP for any and all

---

[1] The motion court record is replete with documents and discovery materials detailing the circumstances that led to the parties' entry into the agreement and the negotiations over the agreement's terms. We have considered the complete record, but we find it unnecessary to detail those circumstances in our analysis of the issues presented on appeal. Our decision not to detail the circumstances shall not be construed as a determination they are not relevant to a jury's determination of the intended meaning of the agreement's various provisions at trial. See generally Conway v. 287 Corp. Ctr. Assocs., 187 N.J. 259, 268-69 (2006).

6

groundwater, surface water, and sediment contamination related thereto, whether same is on or off-site ("Groundwater NFA"), and to satisfy any and all conditions to the Groundwater NFA, (hereinafter collectively referred to as the "Final NFA") and further that such efforts shall not unreasonably interfere with [plaintiffs'] use and occupancy of the Property.

. . . .

(3) submit to NJDEP a request for No Further Action with regard to any remaining soils issues, including but not limited to those relating to the two gasoline and one heating underground storage tanks or the caretaker's septic system now or formerly at the Property, as well as for any other contamination resulting therefrom subsequently identified as a result of such investigations or remediation, on or before November 1, 1991

. . . .

(6) obtain from NJDEP the Final NFA on or before September 8, 2003, unless [the Trust] can show that it has expeditiously, actively and without unreasonable delay undertaken all steps reasonably available to meet this date and that NJDEP has imposed additional requirements that extend beyond that date

. . . .

(8) incorporate the reasonable comments of [plaintiffs'] or [plaintiffs'] designee provided to [the Trust] or [the Trust's] designee within seven (7) days thereafter

Paragraph 2(b) of the agreement states:

7

b.　　[Plaintiffs] covenant and agree to provide reasonable cooperation and access to the Property to [the Trust] or [the Trust's] agents for the purposes of meeting the obligations hereunder, provided, however, that such cooperation shall not be deemed to require [plaintiffs'] to agree to a Declaration of Environmental Restrictions, [CEA], or the construction or installation of any structure, conveyance or edifice, above or below ground, without [plaintiffs'] written consent, which consent will not be unreasonably withheld.

Section 2(d) states:

d.　　[The Trust's] liability for [plaintiffs'] damages pursuant to this covenant #2 shall be limited to actual damages sustained by [plaintiffs].

The Trust's Active Remediation Efforts

From 2000 to 2007, the Trust's environmental consultant, First Environment, Inc. (First Environment), investigated the groundwater contamination at the property. Plaintiffs describe this as "an extensive investigation" that included the installation of "over [twenty] wells and sumps on the [p]roperty." Active remediation of the groundwater contamination did not begin until 2008.

Active remediation of the groundwater contamination took "place during the following periods: (1) August 2008-April 2009; (2) April-November 2010; (3) May 23, 2011; (4) August-December 2011; (5) November 2012-January 2013; and (6) January 2015-March 31, 2016." For example, "activated

persulfate injections were conducted at the [p]roperty . . . over a nine-month period and biweekly samplings of the monitoring wells were obtained" from August 2008 to April 2009. "[A]dditional remedial activities" performed by First Environment from April to November 2010 included: "[t]wo Vapor Enhanced Fluid Recovery Events[,] . . .[s]lug testing[,] . . . a [fifty-two] hour aquifer test for MW-1D[,] . . . [s]ampling sediment contained in the garage drain[,] and . . . [q]uarterly groundwater sampling." Plaintiffs characterize defendants efforts as "a pattern where First Environment and its contractors would . . . employ a form of active remediation, [and] then stop and begin testing the groundwater over an extended period of time[.]"

"A Remedial Action Progress Report (RAPR) discussing the results of these activities was submitted to [the] NJDEP in October 2010" and, "[o]n November 19, 2010, the . . . Trust received approval of the 2010 RAPR from the NJDEP." In approving the RAPR, the NJDEP required the Trust "to conduct indoor air quality sampling in the [c]aretaker's [h]ouse on the [p]roperty" that was conducted on February 24 and 25, 2011.

During the summer and fall of 2011, First Environment "conducted additional persulfate injections" pursuant to "an NJDEP-approved Permit." The Trust retained Thomas Bambrick as the Licensed State Remediation

Professional (LSRP) on May 4, 2012, "to oversee the remediation in accordance with the Site Remediation Reform Act[,]" (SRRA), N.J.S.A. 58:10C-1 to -29. During 2013, "additional persulfate injections" as well as "the installation of two additional injection wells" occurred at the property.

In 2014, MNA was considered by "First Environment and . . . Bambrick . . . as a possible remediation alternative to active remediation."[2] A "Dual Phase Extraction system (DPE)" was installed at the property in January 2015 "to pump and treat groundwater." "[W]eekly effluent groundwater samples" were then collected "directly from the DPE system before the point of discharge into Moggy Brook" so that First Environment could "evaluate the performance of the DPE treatment system and as required pursuant to an NJDEP . . . approval/authorization letter." "[P]eriodic vapor field screening readings from the influent vapor lines prior to treatment" were also "collected several times a week using a calibrated Photoionization Detector."

---

[2] Plaintiffs deny defendants' assertion Bambrick and First Environment considered MNA for the first time in 2014 and claim MNA was in fact considered four years earlier at a 2010 meeting with environmental consultants for defendants' insurance carrier, but the memorandum upon which plaintiffs rely in support of their denial is not included in the appellate record. See R. 2:6-1(a)(1)(I) (requiring the appellant's appendix or any joint appendix on appeal include "such . . . parts of the record . . . as are essential to the proper consideration of the issues"); see also Soc'y Hill Condo. Ass'n, Inc. v. Soc'y Hill Assocs., 347 N.J. Super. 163, 177-78 (App. Div. 2002).

A-2242-20

The End of Active Remediation

On March 31, 2016, "the active remediation system was shut down" at the property.[3] "The Trust's attorneys notified [plaintiffs] of the decision . . . by email one week before" active remediation was terminated without plaintiffs' consent. Plaintiffs assert "[a]ll remediation efforts stopped" at this point, and that this was a unilateral decision by defendants to abandon active remediation, pursue a CEA, and proceed solely with MNA, a process which may take over thirty years to complete.

Defendants claim MNA is a "remedy approved by the NJDEP in its regulations," citing a NJDEP document describing MNA technical guidance. See Monitored Natural Attenuation Technical Guidance, NJ.Gov/DEP, (March 1, 2012) https://www.nj.gov/dep/srp/guidance/srra/mna_guidance_v_1_0.pdf. Thus, defendants claim that MNA is an acceptable remediation methodology.

From April 21 to 22, 2016, "in accordance with the May 2014 [Remedial Action Work Plan] RAWP, First Environment conducted post-remediation groundwater monitoring . . . [,] which included sampling groundwater

---

[3] The parties dispute who ordered the shut-down of active groundwater remediation. Defendants claim active remediation was shut down after fourteen "months of continuous operation" at "the direction of [LSRP] Bambrick." Plaintiffs assert the Trust and its attorneys decided to end the active groundwater remediation.

A-2242-20

monitoring wells." Based on its "review of the most recent post-active remediation laboratory analytical data, as well as an evaluation of all historical groundwater," "First Environment determined that there was an overall historical decrease" in "groundwater contaminant" and that through the remediation efforts, "[r]emoval of both the liquid and vapor contaminants (mainly benzene) had been achieved over time." It was determined benzene was the primary remaining contaminant existing in the groundwater at levels above the NJDEP's Ground Water Quality Standards (GWQS).

A 2017 First Environment Action Report found an "overall decrease in dissolved phase benzene concentrations in the two source area monitoring wells as a result of the remedial actions conducted at the [property], as well as natural degradation." The report further stated benzene contaminant "MW-1D/1DR" concentration levels had been reduced from 1,700 parts per billion (ppb) on December 4, 2002, to 106 ppb on April 22, 2016, and benzene contaminant "MW-8D" concentration had been reduced from 569 ppb on December 2, 2011, to 92 ppb on April 22, 2016. The report attributed the decrease in the benzene levels to "active source area soil removal, active groundwater remediation, and naturally occurring attenuation."

The report also stated that "[b]ased on the asymptotic level with respect to the concentration of benzene and the diminishing returns of operating the DPE system and its associated costs, First Environment" recommended MNA "in concert with establishing a CEA . . . to allow the residual benzene concentrations to attenuate naturally." According to First Environment, the goal of MNA "is to reduce the groundwater benzene concentrations at the [property] to levels that are below the current NJDEP GWQS of 1.0 [ppb] . . . for benzene" and, according to the report, this approach requires a CEA to be put in place at the property and "remain in place until the GWQS . . . is achieved."

Following the Trust's cessation of active remediation, plaintiffs retained Langan Engineering to "review the situation and consider alternative methods of remediating the groundwater." Langan Engineering "proposed two alternatives—thermal conductive heating (TCH) and pneumatic fracturing combined with chemical oxidation." According to Langan Engineering, "TCH would reduce the time to remediate to three years, including the time to design the specific remediation plan, and increase the likelihood of reaching the GWQS to 99%."

Plaintiffs provided the Trust with Langan Engineering's report in September 2016, and "[s]even plus months later the Trust rejected [plaintiffs']

13

proposal as impractical and/or too expensive." Defendants dispute this statement of fact to the extent it suggests "the alternatives were necessary or would be successful[,]" citing to its own expert's report disagreeing with the remediation alternatives recommended by Langan Engineering.

"On July 7, 2017, First Environment submitted an application for a [RAP] to the NJDEP to allow for a CEA at the [p]roperty." "On or about July 11, 2017, a final Remedial Action Report was submitted to [the] NJDEP [detailing the] remediation efforts and requesting that the NJDEP place a CEA on the [p]roperty[,]" so that "MNA of the groundwater" could begin. Before filing this application, the Trust sought plaintiffs' consent, which plaintiffs refused. Plaintiffs asserted "other methods of active remediation are warranted and must continue to completion without a CEA."

On June 18, 2019, the NJDEP designated part of the property "corresponding to the location of the plume of contamination of the groundwater as a CEA." However, the NJDEP has not granted the Trust's "request to naturally attenuate the groundwater. Instead, the NJDEP has required the Trust and First Environment to further delineate the plume of contamination, which required the installation of further wells on the [p]roperty."

A-2242-20

Plaintiffs claim MNA constitutes "passive remediation" that "would not require the Trust to do any remediation[,]" except "[e]very five years over the [thirty] years of MNA, First Environment would visit the [p]roperty and take samples of the groundwater to test." Defendants assert MNA "is considered to be a form of remediation," citing to the NJDEP's published MNA technical guidance. On First Environment's website, it described its work at plaintiffs' property, stating "we therefore deemed the 'no action' alternative [referring to MNA] most appropriate for the" property.

The Trust, through its insurance carrier, has incurred $2.7 million in remediation costs at the property. Plaintiffs have invested over $1,000,000 in improvements on their home "over the [twenty] years they have owned it."

Plaintiffs obtained an appraisal valuing the property at $415,000 "as of September 2018 . . . as a result of the contamination, the need for continuing remediation, and the [p]roperty's designation as a CEA." The appraisal reflects that "[w]ithout contamination, the value would be [$2,700,000,]" and that the "reduction in value is a result of the uncertainty and risks the contamination creates for prospective purchasers and the availability of comparable homes that are not environmentally contaminated." Plaintiffs note they "would have a duty to notify their purchaser of the contamination, rendering the purchaser liable for

15

the clean-up costs," and "N.J.S.A. 58:10-23.11(c)(3) makes anyone who purchases contaminated property strictly liable for the clean-up if they are aware or should have been aware of the contamination."

The Litigation

In 2018, eighteen years after they closed title on the property, and two years after the Trust ceased any active remediation methodologies at the property, plaintiffs filed suit alleging defendants breached the agreement, violated the covenant of good faith and fair dealing, and fraudulently induced them to enter into the agreement.[4]  The gravamen of plaintiffs' claims is the groundwater contamination on the property has not been remediated such that the Trust has complied with what plaintiffs contend is the Trust's contractual obligation to provide an unconditional response action outcome (RAO) from the NJDEP.[5]

---

[4]  Plaintiffs' fraudulent inducement claim was added in an amendment to the original complaint.

[5]  Paragraph 2(a) of the agreement refers to the Trust's obligation to provide conditional or unconditional "NFA's," or "no further action" letters from the NJDEP.  Following the enactment of the SRRA in 2012, the NJDEP no longer issues NFA letters for the contamination at issue here.  Instead, under the SRRA the equivalent of an NFA, a response action outcome (RAO), is issued by an LSRP after approval by the NJDEP.  N.J.A.C. 7:26C-6.2.  Plaintiffs agree a RAO is the equivalent of what was formerly an NFA letter.  Thus, although the

More particularly, plaintiffs' claims are grounded in the assertion that after sixteen years of investigating and employing various active remediation methodologies to address the groundwater contamination on the property, in 2016 the Trust abandoned any further active remediation methodologies in favor of passive MNA, a methodology involving the monitoring of the natural dissipation of the groundwater contamination—a process that is anticipated will take thirty years before the groundwater will satisfy the NJDEP's GWQS such that the NJDEP will issue an unconditional RAO. Plaintiffs claim that although

agreement refers to NFA's, for purposes of consistency and clarity, we refer to both NFA's and RAO's as RAO's under the current nomenclature.

An NFA letter could have been unconditional or conditional. The Remediation Process: Responsible Party Cases, NJ.Gov/DEP, (February 22, 2005), https://www.state.nj.us/dep/srp/community/basics/srbasics_rp.pdf. While an unconditional NFA is one in which there is no further action required and no condition imposed on a landowner, a conditional NFA is one which "involves an institutional control, and if required, an engineering control." No-Further Action Compliance Notice, NJ.Gov/DEP, (May 3, 2021), https://www.nj.gov/dep/srp/enforcement/post_nfa_compliance_notice.pdf. "An institutional control includes . . . a ground[]water [CEA] that the Department establishes for a contaminated ground[]water plume." Ibid.

Today a RAO is similarly issued either with or without conditions; they may be issued on an unrestricted, limited, or restricted basis. Response Action Outcome Guidance Document, NJ.Gov/DEP, 9-10, (Nov, 2021), https://www.nj.gov/dep/srp/guidance/srra/rao_guidance.pdf. A limited or restricted RAO for groundwater contamination, like its predecessor the conditional NFA, may be issued where "the [NJDEP] has established a CEA, and . . . issued a ground[]water remedial action permit." Ibid.

the NJDEP has determined MNA is an acceptable methodology to address the remaining groundwater contamination, the Trust's 2016 decision to rely solely on MNA, instead of other available active methodologies, violates the agreement and is inconsistent with the Trust's expressly stated obligation to "[p]romptly, expeditiously, actively and without delay" obtain a final and unconditional RAO from the NJDEP.

In response to the complaint, defendants denied the allegations and claimed the plain language of the agreement requires only that the Trust obtain a conditional RAO. Defendants further claimed the NJDEP will issue a conditional RAO when plaintiffs honor their contractual obligation to consent to the designation of their property as a CEA thereby allowing MNA, which the NJDEP has approved as an acceptable remediation methodology.

The June 27, 2019 Order

As noted, paragraph 2(b) of the agreement provides that plaintiffs will "provide reasonable cooperation and access to the [p]roperty" to the Trust and its agents "for the purpose of meeting" the Trust's remediation obligations. The provision further states "such cooperation shall not be deemed to require [plaintiffs] to agree to a" CEA "without [plaintiffs'] written consent, which consent shall not be unreasonably withheld."

A-2242-20

Prior to any discovery, defendants moved for partial summary judgment seeking "an order: (a) permitting [the Trust] to seek a CEA designation from the NJDEP and (b) barring [plaintiffs] from recovering damages for the diminution in the value of" the property. At the hearing on the motion, defendants stated they did not seek a determination that plaintiffs unreasonably withheld their consent to a CEA. Instead, they sought only a determination that under the agreement the "Trust is permitted to pursue a [CEA] for the property subject to the plaintiffs' written consent which cannot be unreasonably withheld."

In a June 27, 2019 written opinion on defendants' motion, the court found the agreement permitted "implementation" of a CEA for groundwater and the Trust was entitled to seek a CEA designation for plaintiffs' property. The court reasoned that paragraphs 2(a)(1) and 2(b) of the agreement allow the Trust to seek a CEA designation because those provisions authorized the Trust to obtain either a conditional or unconditional RAO, and a CEA designation may be properly imposed for a conditional RAO.

The court did not address or decide plaintiffs' argument that under paragraph 2(b) of the agreement, they are entitled to withhold consent to a CEA designation if the consent is not unreasonably withheld. The court also did not

19

address or decide plaintiffs' claim that whether their withholding of consent is reasonable presents a fact issue for a jury.[6] The court similarly did not decide the merits of defendants' motion seeking summary judgment on plaintiffs' damages claim for a diminution of the value of their property. The court found the motion was premature.

On June 27, 2019, the court granted the motion in part and denied it in part. The court ordered that the Trust was "entitled to seek a" CEA from the NJDEP, but it denied the Trust's request for an order barring plaintiffs' from recovering damages based on the diminution of the value of their property. In any event, earlier that month, and prior to the court's order, the NJDEP designated part of plaintiffs' property as a CEA.

---

[6] The court also did not address plaintiffs' argument there were numerous genuine issues of material fact that precluded a proper award of summary judgment on defendants' claim the Trust was entitled to a judgment allowing it to apply for a CEA for plaintiffs' property. The asserted issues of fact included: the "interpretation of the contract and whether [defendants] . . . satisfied [their] obligations to remediate"; "whether [defendants] may seek a CEA under" paragraph 2(a)(1) "or whether it is limited to seeking it under [2(b)]"; whether plaintiffs' proposed alternative remediation methods "must be followed or whether they're" impractical; and whether defendants may seek a CEA without the consent of plaintiffs and without a determination by judge or jury that plaintiffs' withholding of consent was unreasonable.

Following a lengthy discovery process, which resulted in an amendment to the complaint adding a fraudulent inducement cause of action, defendants moved for summary judgment on plaintiffs' claims; plaintiffs moved for partial summary judgment on defendants' counterclaim seeking to compel plaintiffs to execute a RAP authorizing the CEA designation and MNA on their property; and defendants cross-moved for summary judgment on their counterclaim seeking an order directing that plaintiffs execute the RAP.

In support of their motions, defendants argued: they are not required to obtain an unconditional RAO for the groundwater contamination; they are only required to obtain a conditional RAO; and they complied with that obligation by obtaining the approval of the LSRP, Bambrick, for a conditional groundwater RAO based on the CEA designation, which allowed MNA as a permitted remediation methodology. Defendants claimed the judge who entered the June 27, 2019 order held they could seek a conditional RAO, the judge's ruling constituted the "law of the case," and plaintiffs improperly sought "reconsideration of [this] issue . . . without filing for reconsideration." Thus, defendants asserted plaintiffs' breach of contract and breach of the duty of good

21

faith and fair dealing failed as a matter of law because the Trust complied with its groundwater remediation obligations under the agreement.

Defendants also asserted that plaintiffs' claims were time barred under the six-year statute of limitation for contract actions. See N.J.S.A. 2A:14-1. Defendants argued paragraph 2(a)(5) required the Trust obtain a "[f]inal" RAO "by September 8, 2003," and that, although plaintiffs recognize that did not occur, they waited fifteen years until 2018 to file their complaint.

Defendants further argued plaintiffs' lacked evidence supporting their punitive damages claim, and plaintiffs similarly failed to present evidence they were fraudulently induced into entering into the agreement. Defendants also asserted plaintiffs' compensatory damages claim should be dismissed because plaintiffs opted for the remedy of remediation by entering into the agreement and plaintiffs thereby waived their right to damages caused by the groundwater remediation permitted under the agreement.

Plaintiffs argued defendants misinterpreted the agreement as requiring defendants to employ only the groundwater remediation methodologies directed by the NJDEP. Plaintiffs claimed the plain language of the agreement, and the available extrinsic evidence related to the circumstances attendant to the parties' entry into the agreement, establish the Trust is obligated to "promptly,

expeditiously, actively, and without delay" seek not only a conditional RAO, but also a final unconditional RAO. Plaintiffs further asserted that although a CEA designation and thirty years or more of MNA are acceptable to the NJDEP, the agreement defines the Trust's obligations to plaintiffs, and MNA, which defendants acknowledge is passive remediation, violates the Trust's obligation to expeditiously and actively obtain a final unconditional RAO from the NJDEP.

Plaintiffs also argued paragraph 2(a)(6) allowed defendants time beyond the original September 8, 2003 deadline to obtain the final RAO, and the asserted causes of action did not accrue until 2016, when defendants breached their obligation to actively seek a final RAO by opting to limit their remediation efforts to the passive MNA methodology. Plaintiffs therefore claimed their complaint was timely filed in 2018.

Plaintiffs also claimed the court could not properly order them to execute the RAP because it permitted the CEA designation, the agreement did not require their consent to a CEA and, in accordance with the agreement, their refusal to consent was reasonable and presented a fact issue for resolution by a jury. Plaintiffs further claimed they were entitled to seek damages under paragraph 2(d) of the agreement.

In a detailed and lengthy written opinion, the court rejected defendants' argument that plaintiffs' claims are time barred. The court found the asserted causes of action did not accrue until 2016, when plaintiffs allege defendants breached the agreement by ending their active remediation methodologies and opting solely for passive MNA.

The court otherwise granted defendants' motion and cross-motion, awarding summary judgment dismissing plaintiffs' three causes of action and ordering that plaintiffs sign the RAP. In granting summary judgment on the breach of contract and breach of the duty of good faith and fair dealing claims, the court found the plain and unambiguous language of the agreement required only that the Trust obtain either a conditional or unconditional RAO, and the NJDEP will issue a conditional RAO based on the CEA designation and MNA remediation methodology. Thus, the court concluded as a matter of fact and law that the Trust complied with its obligations under paragraph 2(a)(1) of the agreement by obtaining a conditional RAO. The court also reasoned that the appropriateness of the actual remediation methodology to be utilized to address the groundwater contamination was not an issue that it could decide because the acceptable remediation methodologies are within the control and primary jurisdiction of the LSRP and NJDEP under the SRRA.

A-2242-20

The court awarded defendants summary judgment on plaintiffs' fraudulent inducement claim, which was founded on the deposition testimony of the attorney who negotiated the agreement on the Trust's behalf. The attorney testified that during the negotiations over the agreement he did not believe the Trust would be able to remediate the groundwater contamination by the putative September 8, 2003 deadline in paragraph 2(a)(6). Plaintiffs claim defendants' counsel did not disclose that belief during the negotiations over the agreement and, by failing to do so, fraudulently induced them into entering into an agreement that included a September 8, 2003 putative deadline.

The court dismissed the claim, finding plaintiffs lacked evidence defendants knew or believed any representations made by them were false or misleading, the attorney's belief was nothing more than his opinion, plaintiffs knew about the "contamination before they closed" title, and "[p]laintiffs were indisputably as informed as [d]efendants to make their own assessment about the likelihood of success in reaching the" NJDEP groundwater standards. Based on these findings, the court held that plaintiffs failed to "establish the elements for [a] fraudulent inducement claim."

The court also determined plaintiffs could not sue for damages based on the diminution of the value of their property alone, and plaintiffs could only

pursue a damages claim if they established defendants breached the agreement. The court reasoned the agreement expressly allowed for, and anticipated, there would be remediation methodologies implemented at the property, and the agreement made no provision for payments or damages based on the diminution of the value for the property while the agreed upon remediation took place. Because it determined defendants complied with the agreement, the court concluded plaintiffs were not entitled to alleged damages based on the alleged diminution of the property's value caused by the ongoing remediation. The court also determined plaintiffs did not present any evidence supporting an award of punitive damages.

The court granted summary judgment on defendants' counterclaim and ordered plaintiffs to sign the RAP consenting to the CEA designation and MNA. Relying on the prior judge's June 27, 2017 order, the court found it was the law of the case that plaintiffs' consent to the CEA was not required and defendants did not breach the agreement by seeking the CEA designation without plaintiffs' consent.

The court held that under the agreement, plaintiffs are permitted to lodge objections with the NJDEP, but defendants do not need to obtain plaintiffs' consent to the groundwater remediation methodologies they choose to satisfy

26

their groundwater remediation obligations under paragraph 2(a)(1). The court further reasoned that because the agreement allows defendants to seek a conditional RAO from the NJDEP which "will be issued . . . when the remedy for the groundwater through [MNA] is approved after the RAP is signed," plaintiffs are required to sign the RAP to allow defendants to proceed.

The court entered two March 11, 2021 orders memorializing its decisions. Plaintiffs appeal from those orders, as well as the June 27, 2019 order. Defendants cross-appeal from the March 11, 2021 order denying its summary judgment motion based on statute of limitations grounds.

II.

The court granted defendants summary judgment on plaintiffs' breach of contract and breach of the covenant of good faith and fair dealing claims based on its conclusion defendants' provision of the conditional RAO satisfied its obligations under the plain and unambiguous language of the agreement. More particularly, the court determined the agreement requires only defendants provide a conditional RAO concerning groundwater contamination from the NJDEP. Because it is undisputed defendants sought the CEA and approval of MNA necessary for a conditional RAO, the court concluded defendants satisfied their contractual groundwater remediation obligations to plaintiffs.

27

Plaintiffs argue the court erred in its interpretation of the agreement, its conclusion the agreement unambiguously requires defendants to provide only a conditional RAO, and its refusal to consider extrinsic evidence establishing an interpretation of the agreement's terms different than the one argued by defendants. Plaintiffs rely on a different interpretation of the agreement they claim is supported by its plain language requiring defendants "expeditiously, actively and without delay" obtain a final unconditional RAO for the groundwater contamination, and plaintiffs contend their proffered extrinsic evidence further establishes that was the parties' intention.

"It is well-settled that '[c]ourts enforce contracts "based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract."'" Barila v. Bd. of Educ. of Cliffside Park, 241 N.J. 595, 615-16 (2020) (alteration in original) (quoting In re Cnty. of Atl., 230 N.J. 237, 254 (2017)). In interpreting a contract, the court must consider the "language 'in the context of the circumstances' at the time of drafting and . . . apply 'a rational meaning in keeping with the expressed general purpose.'" In re Cnty. of Atl., 230 N.J. at 254 (quoting Sachau v. Sachau, 206 N.J. 1, 5-6 (2011)). A contract "should be read 'as a whole in a fair and common[-]sense manner.'" Manahawkin Convalescent v. O'Neill, 217 N.J. 99,

28

118 (2014) (quoting Hardy ex rel. Dowdell v. Abdul-Matin, 198 N.J. 95, 103 (2009)).

"The plain language of the contract is the cornerstone of the interpretive inquiry." Barila, 241 N.J. at 616. Where "the language of a contract 'is plain and capable of legal construction, the language alone must determine the agreement's force and effect.'" Manahawkin Convalescent, 217 N.J. at 118 (quoting Twp. of White v. Castle Ridge Dev. Corp., 419 N.J. Super. 68, 74-75 (App. Div. 2011)). Where a contract is unambiguous, "[g]enerally . . . 'the words presumably will reflect the parties' expectations.'" Globe Motor Co. v. Igdalev, 225 N.J. 469, 483 n.4 (2016) (quoting Kieffer v. Best Buy, 205 N.J. 213, 223 (2011)). A contract provision is ambiguous where it is "subject to more than one reasonable interpretation." Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 200 (2016).

Extrinsic evidence may be considered to determine whether a contract term is ambiguous. Conway, 187 N.J. at 268-69. Indeed, "[e]ven in the interpretation of an unambiguous contract, [the court] may consider 'all of the relevant evidence that will assist in determining [its] intent and meaning.'" Manahawkin Convalescent, 217 N.J. at 118 (second alteration in original) (quoting Conway, 187 N.J. at 269). Although the parol evidence rule generally

"prohibits the introduction of evidence that tends to alter an integrated written document[,]" Conway, 187 N.J. at 268, "New Jersey follows an expansive approach on the use of parol evidence," YA Glob. Invs., LP v. Cliff, 419 N.J. Super. 1, 12 (App. Div. 2011).

Under this expansive view "[e]vidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. This is so even when the contract on its face is free from ambiguity." Conway, 187 N.J. at 269 (alteration in original) (quoting Atl. N. Airlines, Inc. v. Schwimmer, 12 N.J. 293, 301 (1953)). Thus, considerations for the court in interpreting a contract "may 'include . . . the particular contractual provision, an overview of all the terms, the circumstances leading up to the formation of the contract, custom, usage, and the interpretation placed on the disputed provision by the parties' conduct.'" Ibid. (quoting Kearny PBA Local # 21 v. Kearny, 81 N.J. 208, 221 (1979)). This evidence may be utilized because "[t]he polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety; . . . the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded." Ibid. (quoting Schwimmer, 12 N.J. at 301).

However, "[s]uch evidence is adducible only for the purpose of interpreting the writing—not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning of what has been said." Ibid. (quoting Schwimmer, 12 N.J. at 302). Therefore, "[s]o far as the evidence tends to show, not the meaning of the writing, but an intention wholly unexpressed in the writing, it is irrelevant." Ibid. (emphasis added) (quoting Schwimmer, 12 N.J. at 302). "[T]here is a 'distinction between the use of evidence of extrinsic circumstances to illuminate the meaning of a written contract, which is proper, and the forbidden use of parol evidence to vary or contradict the acknowledged terms of an integrated contract.'" YA Glob. Invs., LP, 419 N.J. Super. at 12 (quoting Garden State Plaza Corp. v. S. S. Kresge Co., 78 N.J. Super. 485, 497 (App. Div. 1963)).

In paragraph 2(a) of the agreement, the Trust assumed "Environmental Obligations" concerning the soil and groundwater contamination on the property. As noted, the Trust agreed to

> (1) promptly, expeditiously, actively and without delay seek an unconditional No Further Action Letter and Covenant Not to Sue from the NJDEP for all soil issues associated with the two gasoline and one heating oil underground storage tanks and the caretaker's septic system now or formerly on the [p]roperty, any other soils contamination subsequently identified as a result of such investigations or remediation, either a

31

conditional or unconditional <u>No Further Action Letter</u> <u>and Covenant Not to Sue from NJDEP for any and all</u> <u>groundwater, surface water, and sediment</u> <u>contamination</u> related thereto, whether same is on or off-site (<u>"Groundwater NFA"</u>), <u>and to satisfy any and</u> <u>all conditions to the Groundwater NFA, (hereinafter</u> <u>collectively referred to as the "Final NFA"</u>) and further that such efforts shall not unreasonably interfere with [plaintiffs'] use and occupancy of the [p]roperty;

. . . .

(6) <u>obtain from NJDEP the Final NFA on or before</u> <u>September 8, 2003, unless [the Trust] can show that it</u> <u>has expeditiously, actively and without unreasonable</u> <u>delay undertaken all steps reasonably available to meet</u> <u>this date</u> and that NJDEP has imposed additional requirements that extend beyond that date;

[(Emphasis added).]

The court granted summary judgment on plaintiffs' breach of contract and breach of the covenant of good faith and fair dealing claims based on its determination paragraph 2(a)(1) unambiguously required only that the Trust obtain a conditional or unconditional RAO. In doing so, the court did not recognize there is a reasonable alternative interpretation of paragraph 2(a)(1) and, as result, the agreement is ambiguous. See <u>Templo Fuente De Vida Corp.</u>, 224 N.J. at 200.

The plain language of paragraph 2(a)(1) required the Trust to "promptly, expeditiously, actively and without delay seek . . . either a conditional or

32 <span style="float:right">A-2242-20</span>

unconditional [RAO] and Covenant Not to Sue from NJDEP for any and all groundwater," which the agreement designates as a "Groundwater [RAO]." It is this language upon which the motion court relied, and defendants rely, to define the Trust's obligations to address groundwater contamination and to limit those obligations to merely seeking and obtaining a conditional RAO. The motion court further relied exclusively on this language in determining that, as a matter of law, defendants satisfied their groundwater remediation obligations to plaintiffs because defendants will obtain an RAO conditioned on the NJDEP's designation of the property as a CEA and the implementation of MNA as the future remediation methodology.

The error in the court's analysis, and the flaw in defendants' argument, is that paragraph 2(a)(1) also supports the reasonable interpretation the Trust is required to do more than obtain a conditional RAO. Although ignored by the motion court and defendants, paragraph 2(a)(1) may also be reasonably interpreted to provide that the Trust shall "promptly, expeditiously, actively and without delay . . . satisfy any and all conditions to the Groundwater [RAO]." That is, the Trust is not only obligated to "promptly, expeditiously, actively and without delay seek" the Groundwater RAO, which may or may not be conditional, but the Trust is also required to "promptly, expeditiously, actively

33

and without delay . . . satisfy any and all conditions" of the Groundwater RAO and obtain what the agreement labels a "Final [RAO]." Stated differently, the plain language of the provision supports plaintiffs' claim defendants are obligated to provide a Final RAO, which is unconditional because it must satisfy all the conditions of any conditional Groundwater RAO.

Indeed, it appears the parties expressly reaffirmed the Trust's obligation to obtain a Final RAO, which by definition constitutes an unconditional RAO. Paragraph 2(a)(6) of the agreement provides that the Trust is obligated obtain a Final RAO—an RAO and Covenant Not to Sue addressing groundwater contamination with all conditions satisfied—prior to September 8, 2003, "unless [the Trust] could show that it . . . expeditiously, actively and without unreasonable delay undertaken all reasonable steps to meet [that] date and . . . [the] NJDEP" imposed additional requirements.

These provisions undermine defendants' claim and the motion court's conclusion the plain language of the agreement unambiguously requires that the Trust only obtain a conditional RAO to fulfill its obligation to address the groundwater contamination. To the contrary, paragraphs 2(a)(1) and 2(a)(6) support plaintiffs' reasonable interpretation the agreement requires the Trust

obtain a Final RAO addressing the groundwater contamination and, as noted, the parties agreed a Final RAO is one in which there are no further conditions.

Defendants argue the agreement does not require that the Trust engage in any particular methodology to satisfy the NJDEP requirements for either a conditional or final RAO. Defendants therefore claim the LSRP's recommendation for a CEA designation and MNA, pursuant to which the Trust might finally obtain a Final RAO as to the groundwater contamination in thirty years, satisfies its obligations under the paragraph 2(a)(1).

To be sure, the agreement does not identify the precise methodologies the Trust must employ to remediate the groundwater contamination to acceptable GWQS. Paragraph 2(a)(1) states only that the Trust must first "seek . . . either a conditional or unconditional" RAO. But, in our view, it would be illogical to conclude paragraph 2(a)(1) required nothing more than that the Trust merely request—seek—either a conditional or unconditional RAO for the groundwater contamination. The provision on its face may be reasonably interpreted to require that the Trust fulfill its groundwater remediation obligation to promptly, expeditiously, actively and without delay obtain a Final RAO by actually employing appropriate remediation methodologies to do so. Defendants do not argue to the contrary.

35

That reasonable interpretation is also supported by paragraph 2(a)(1)'s requirement the Trust's efforts to obtain the Groundwater RAO and Final RAO, "shall not unreasonably interfere with [plaintiffs'] use and occupancy of the [p]roperty." Such a provision is wholly superfluous unless the parties intended that the actual employment of active remediation methodologies—which might interfere with plaintiffs' use of the property—was an obligation imposed on the Trust under paragraph 2(a)(1).

Thus, the language in the agreement supports plaintiffs' reasonably proffered interpretation that the Trust is required to "seek" a conditional or unconditional RAO by engaging in actual remediation efforts and methodologies at the property. And, again, although not precisely defining the remediation methodologies, the agreement provides the Trust's required actions—its methodologies—must be undertaken "promptly, expeditiously, actively and without delay" in order to obtain a Final RAO.

As noted, the agreement also provides that even after the Trust obtains a conditional RAO, it must "promptly, expeditiously, actively and without delay . . . satisfy" the "conditions" of a conditional groundwater RAO and thereby provide a Final RAO. The agreement does not define the term "conditions," and defendants suggest that satisfaction of the conditions

36

mandates only compliance with a plan, and employing a methodology, acceptable to the NJDEP. According to defendants, that means the Trust fully satisfies its obligation to satisfy the conditions of the anticipated conditional RAO by obtaining plaintiffs' consent to the CEA designation and utilizing MNA until the groundwater—thirty years from now—is sufficiently remediated to satisfy the NJDEP's requirements such that a Final RAO will issue.

The language in paragraph 2(a)(1) neither contradicts nor supports defendants' interpretation of the terms defining the Trust's obligation to "satisfy any and all conditions" of the putative conditional RAO that will be issued based on the designation of the property as a CEA and employment of MNA as a remediation methodology. However, there is another plausible and perhaps more reasonable interpretation of the provision—that is, satisfaction of the conditions of the conditional groundwater RAO requires a reduction of the groundwater contamination to acceptable levels under the GWQS because it is satisfaction of that condition, not the employment of the remediation methodologies to satisfy it, which is required to obtain a Final RAO.

Under that reasonable interpretation of the agreement, the Trust must satisfy the conditions for a Final RAO—reduction of the groundwater contamination to acceptable levels under the GWQS—"[p]romptly,

37

expeditiously, actively and without delay."  And that is the contractual duty plaintiffs claim defendants breached by deciding in 2016 to forego the active remediation methodologies proposed by its experts in favor of the passive MNA acceptable to the NJDEP.  In other words, plaintiffs argue that under their reasonable interpretation of the agreement, the Trust breached its obligation to promptly, expeditiously, actively, and without delay employ available active groundwater remediation methodologies to deliver the requisite Final RAO when, in 2016, it opted to abandon any further active remediation in favor of the passive and incredibly long range MNA as its sole remediation methodology.

We agree with plaintiffs that under its reasonable interpretation of the Trust's obligations under the agreement, the NJDEP's acceptance of MNA as a permissible means of remediating the groundwater contamination is irrelevant to a proper determination of plaintiffs' causes of action.  This is because under plaintiffs' reasonable interpretation of the agreement, the Trust made a contractual commitment to "promptly, expeditiously, actively and without delay" employ whatever remediation methodologies are required to obtain a Final RAO satisfying all the GWQS requirements, and there is no language in the agreement permitting the Trust to abandon that obligation by obtaining the NJDEP's acceptance of a remediation methodology that is not prompt,

expeditious, and active, or that will result in a thirty-year delay, when methodologies are available that will fulfill the Trust's contractual obligations more promptly, expeditiously, actively, and without an additional thirty years of delay. Moreover, there is no evidence the NJDEP would prohibit defendants from employing further active remediation methodologies, such as those proposed by plaintiffs' expert, Langan Engineering.[7] The evidence shows

---

[7] We agree the NJDEP generally has primary jurisdiction over the determination of acceptable remediation methodologies, see generally Magic Petroleum Corp. v. Exxon Mobil Corp., 218 N.J. 390, 407 (2014), but the issues presented by plaintiffs' causes of action on the motions for summary judgment did not require that the court determine whether a CEA designation and MNA constituted acceptable remediation methodologies; the causes of action and motions required a determination as to whether the Trust breached what plaintiffs contend is the Trust's obligation to promptly, expeditiously, actively, and without delay employ remediation methodologies to obtain a Final RAO. Of course, any such methodology would require the approval of the NJDEP, but there is no evidence defendants presented the active remediation methodologies suggested by Langan Engineering to the NJDEP for approval or that the methodologies were prohibited by the NJDEP. Instead, as we explain, the LSRP considered the methodologies proposed by Langan Engineering and found them "not consistent or appropriate" based solely on their cost. The LSRP did not determine the proposed active remediation methodologies were prohibited. In its consideration of the summary judgment motions, the court was required to determine the scope of the Trust's contractual obligations under the agreement and whether the undisputed facts established its compliance with those obligations. We therefore find it unnecessary to address plaintiffs' claim defendants waived their right to assert the court lacked primary jurisdiction over the determination of the appropriate methodologies for the groundwater remediation.

39

Bambrick apparently rejected plaintiffs' alternative proposed active remediation methodologies, but he did so in part based on cost and relative effectiveness and without regard to defendants' obligations under the agreement. The agreement did not limit the Trust's groundwater remediation obligations based on cost. Additionally, plaintiffs presented evidence showing defendants and their counsel actually made the decision, rather than the LSRP, to halt active remediation and proceed with MNA.[8]

Our discussion about the reasonable interpretations of the various contractual provisions concerning the Trust's groundwater remediation obligations do not constitute findings as to the meanings of any of the pertinent provisions as a matter of law, or an opinion on the merits of plaintiffs' claims. Instead, we determine only that the contractual provisions governing the Trust's groundwater remediation obligations are not, as argued by defendants and as found by the court, clear and unambiguous. The motion court erred by finding

---

[8] For example, plaintiffs cite the deposition testimony of Stacy Martin, a trust officer with defendants, that it was the Trust's counsel "who decided to halt the active remediation" and that defendants ratified the decision. LSRP Bambrick explained that he recommended the passive remediation approach, but he discussed it with the Trust's counsel and it was adopted after the Trust and their counsel agreed. Monica Shroeck, counsel to defendants, was also deposed and testified CEA was discussed with Bambrick beginning in 2014, and the defendants approved the proposed switch to MNA on March 31, 2016.

otherwise and by thereby determining the undisputed facts established defendants are entitled to judgment as a matter of law on plaintiffs' breach of contract and breach of the duty of fair dealing claims. A jury must decide the meaning of the parties' agreement in the first instance based on its language and any relevant extrinsic evidence, and it must then determine whether defendants breached any contractual duty owed to plaintiffs under the agreement or breached the covenant of good faith and fair dealing.[9] See Driscoll Const. Co.,

---

[9] We observe that a breach of the covenant of good faith occurs when one party has "destroyed [the other party's] reasonable expectations and right to receive the fruits of the contract." Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 425 (1997). In establishing a breach of this covenant, "[p]roof of 'bad motive or intention' is vital." Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 182 N.J. 210, 225 (2005) (quoting Wilson v. Amerada Hess Corp., 168 N.J. 236, 251-52 (2001)). "Without bad motive or intention, discretionary decisions that happen to result in economic disadvantage to the other party are of no legal significance." Amerada Hess Corp., 168 N.J. at 251. Alternatively, a breach may be established if the defendant is shown to have exercised their discretion "arbitrarily, capriciously, or inconsistent with reasonable expectations of parties." Id. at 247. Because this analysis looks to the intentions and expectations of the parties, extrinsic or parol evidence is permitted. Seidenberg v. Summit Bank, 348 N.J. Super. 243, 259 (App. Div. 2002). We agree with plaintiffs that the evidence presented, when considered in the light most favorable to plaintiffs, supports a finding defendants acted in a manner inconsistent with the reasonable expectations of the parties under the agreement by abandoning active and more expeditious remediation methodologies in favor of perhaps thirty years of MNA, and they did so for the purpose of limiting their expenses under an agreement that did not include an express monetary cap on their financial obligations to promptly, expeditiously, actively, and without delay obtain a Final RAO.

41

v. State, Dep't of Transp., 371 N.J. Super. 304, 314 (App. Div. 2004) ("[W]here there is uncertainty, ambiguity or the need for parol evidence in aid of interpretation, then the doubtful provision should be left to the jury." (quoting Great Atl. & Pac. Tea Co. v. Checchio, 335 N.J. Super. 495, 502 (App. Div. 2000))).

We therefore reverse the court's March 11, 2021 summary judgment orders on plaintiffs' contract and breach of the covenant of good faith and fair duty causes and remand for further proceedings.[10]  This opinion should not be construed as ruling on the merits of the plaintiffs' claims or defendants' opposition to those claims, or a determination of the meaning of the agreement as a matter of law.  Those issues shall be decided by the jury based on the evidence presented.  On remand, plaintiffs are free to fully prosecute their breach of contract and breach of the covenant of good faith and fair dealing claims, and defendants shall be entitled to assert any relevant defenses.

---

[10]  We also note the court shall, subject to applicable Rules of Evidence, admit extrinsic evidence relevant to the jury's determination of the intention of the parties, the meaning of the agreement's terms, and other relevant issues presented at trial.  See generally Conway, 187 N.J. 268-69.

## III.

We also consider plaintiffs' claim the court erred by entering the June 27, 2019 order allowing defendants to apply for a CEA designation on the property. The court entered the order after NJDEP issued the CEA designation, and it is therefore unclear what import or effect, if any, the court's order had on the NJDEP's designation. In issuing its order, the motion court expressly did not determine plaintiffs were required to consent to the designation or order that they consent, and the court seemingly determined the Trust was entitled to request the CEA designation for plaintiffs' property without regard to plaintiffs' consent.

We reverse the court's order to the extent it may be interpreted to authorize the Trust to seek a CEA without plaintiffs' consent because although the agreement anticipated a possible CEA designation in paragraph 2(b), the provision expressly reserved to plaintiffs the right to reasonably withhold their consent. The court's June 27, 2019 decision and order failed to give effect to plaintiffs' reasonable interpretation of paragraph 2(b) as permitting them to reasonably withhold their consent and deprived plaintiffs of a legal and factual determination as to whether they reasonably withheld their consent under paragraph 2(b).

A-2242-20

Plaintiffs argued they reasonably withheld consent because the CEA designation and planned MNA violated the Trust's obligation to promptly, expeditiously, actively and without delay employ the remediation methodologies required to obtain a Final RAO. The nature and extent of plaintiffs' putative right to withhold consent and the reasonableness of plaintiffs' decision to withhold consent under paragraph 2(b) of the agreement required a determination by a jury after a trial. The court thereby erred by ignoring plaintiffs' reasonable interpretation of paragraph 2(b), granting summary judgment allowing the Trust to request the CEA without a determination of the nature and extent of plaintiffs' right to withhold consent and the reasonableness of plaintiffs' decision to withhold consent, and granting partial summary judgment on plaintiffs' cross-claim. We therefore reverse the June 27, 2019 order.[11]

For the same reason, we reverse the court's March 11, 2021 order directing plaintiffs execute the RAP permitting the CEA designation and authorizing MNA. The court directed plaintiffs' execution of the RAP on its incorrect

---

[11] Given that it appears the NJDEP imposed a CEA designation on the property prior to the June 27, 2019 order, we offer no opinion on what, if any, effect the reversal of the order has on the NJDEP's actions or plaintiffs' claims against defendants. We leave that issue to the parties and the court on remand.

determination that the unambiguous terms of the agreement, and the undisputed facts, establish the Trust is in compliance with its contractual groundwater remediation obligations and thus is entitled, under the agreement, to pursue CEA and MNA as the sole remediation methodology. As we have explained, prior to reaching such a determination, a jury first must determine the meaning of the agreement and the Trust's compliance with the agreement's requirements. Lacking such a determination, the summary judgment record does not permit entry of any order finding plaintiffs are contractually obligated to execute the proposed RAP.

In sum, we reverse the June 27, 2019 order, and we reverse the March 11, 2021 order granting defendants summary judgment on their cross-claim for an order directing that plaintiffs execute the proposed RAP.

IV.

Plaintiffs also appeal from the order granting defendants' motion for summary judgment on plaintiffs' cause of action for fraudulent inducement. As noted, the motion court found plaintiffs failed to present sufficient evidence supporting the claim. We agree and affirm the court's order.

To establish a claim of fraud, a plaintiff must show: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by

the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (1997).  "Included within the first element are promises made without the intent to perform since they are 'material misrepresentations of the promisor's state of mind at the time of the promise.'"  Bell Atl. Network Servs., Inc. v. P.M. Video Corp., 322 N.J. Super. 74, 95-96 (App. Div. 1999) (quoting Dover Shopping Ctr., Inc. v. Cushman's Sons, Inc., 63 N.J. Super. 384, 391 (App. Div. 1960)).  "[E]very fraud in its most general and fundamental conception consists of the obtaining of an undue advantage by means of some act or omission that is unconscientious or a violation of good faith."  Marino v. Marino, 200 N.J. 315, 340-41 (2009) (quoting Jewish Ctr. of Sussex Cnty. v. Whale, 86 N.J. 619, 624 (1981)).

"[T]o form the basis for an action in deceit, the alleged fraudulent representation must relate to some past or presently existing fact and cannot ordinarily be predicated upon matters in futuro."  Ocean Cape Hotel Corp. v. Masefield Corp., 63 N.J. Super. 369, 380 (App. Div. 1960).  "Statements as to future or contingent events, to expectations or probabilities, or as to what will or will not be done in the future, do not constitute misrepresentations, even though they may turn out to be wrong."  Alexander v. CIGNA Corp., 991 F.

46

Supp. 427, 435 (D.N.J. 1997).  Similarly, "neither expressions of opinion nor 'puffery,' will satisfy this element of fraud."  Suarez v. E. Int'l Coll., 428 N.J. Super. 10, 29 (App. Div. 2012) (citations omitted).  In discerning the difference between fact and opinion, a statement of fact is one that is "susceptible of exact knowledge when the statement was made," whereas a statement is an opinion if "it is unsusceptible of proof" at that time.  Joseph J. Murphy Realty, Inc. v. Shervan, 159 N.J. Super. 546, 551 (App. Div. 1978) (quoting 37 Am. Jur. 2d, Fraud and Deceit, § 46).

Plaintiffs argue that a statement made during the deposition testimony of the Trust's counsel who negotiated the agreement provides the grounds for their fraudulent inducement claim.  Counsel testified that at the time he negotiated the agreement he believed it "very unlikely" the groundwater contamination could be remediated by the September 8, 2003 date in paragraph 2(a)(6) of the agreement.  Plaintiffs argue counsel's testimony established "[d]efendants knowingly misrepresented their ability to clean up the groundwater" at the property, and plaintiffs relied on the misrepresentation, not discovering the "fraud until November 2019" when counsel testified at his deposition.

When asked if there was any evidence supporting the fraudulent inducement claim other than the Trust's counsel's testimony that he believed it

"very unlikely" the groundwater contamination would be remediated by September 8, 2003, plaintiff Michael K. Furey testified, "That and common sense . . . I can't point to a document . . . I can't identify a conversation between [the Trust's counsel] and a First Environment consultant, but that doesn't mean those conversations didn't take place." Michael K. Furey also could not point to any evidence the Trust's counsel shared his opinion with the Trust, and Furey acknowledged he "has not seen any documents that suggest the information [p]laintiffs received before closing was incorrect."

Based on the parties' <u>Rule</u> 4:46-2 statements of undisputed facts and their respective responses, the only purported evidence of fraud by either a failure to disclose or a material misrepresentation supporting plaintiffs' fraudulent inducement is testimony by plaintiffs' counsel who negotiated the agreement on their behalf that he "believe[d] . . . [the Trust's counsel] made a representation of [the Trust's] ability to complete the cleanup by 2003," and the Trust's counsel's 2019 deposition testimony he believed the Trust's ability to achieve that result was "very unlikely." We are not persuaded that evidence, even when viewed in a light most favorable to plaintiff, supports the asserted fraudulent inducement claim.

In the first instance, the Trust's counsel's belief concerning his client's ability to complete the groundwater remediations constitutes an opinion rather than a statement of fact, as it was not "susceptible of exact knowledge when the" belief was held. Joseph J. Murphy Realty, Inc., 159 N.J. Super. at 551 (quoting 37 Am. Jur. 2d, Fraud and Deceit, § 46). And, any expression of his opinion concerning the possible completion date was not one based on past or presently existing facts, but instead represented a statement of intention and expectation which cannot, without more, provide a basis for a fraud claim. Ocean Cape Hotel Corp., 63 N.J. Super. at 380; Alexander, 991 F. Supp. at 435.

In addition, to sustain a fraudulent inducement claim, any statements made by the Trust's counsel to plaintiffs' counsel concerning the possible groundwater remediation completion date must have been made with an intent not to perform. Bell Atl. Network Servs., 322 N.J. Super. at 95-96. However, at the time the parties entered the agreement, the Trust had been acting to address the groundwater since the oil spill was discovered in 1999 and continued to act to address groundwater contamination in a manner which generally satisfied plaintiffs until active remediation was shut down in 2016. Plaintiffs do not point to any evidence the Trust did not intend to conduct a clean-up and complete that

clean-up by September 8, 2003, at the time the parties entered into the agreement.

Further, plaintiffs' fraudulent inducement claim fails because the agreement does not provide a firm September 8, 2003 date for completion of the groundwater remediation. Paragraph 2(a)(6) provides that a Final NFA letter must be obtained by September 8, 2003, "unless [the Trust] can show that it has expeditiously, actively and without unreasonable delay undertaken all steps reasonably available to meet this date." The Trust did not agree to conclusively resolve the groundwater contamination by 2003, but committed only to expeditiously, actively and without unreasonable delay undertake the reasonably available steps to do so. Thus, plaintiffs could not have reasonably relied on any purported commitment to complete the groundwater remediation by September 8, 2003, because they agreed to paragraph 2(a)(6), which requires only that the Trust attempt to complete the remediation by that date. Plaintiffs do not allege the Trust failed to honor their obligations under paragraph 2(a)(6).

Plaintiffs assert the Trust had an affirmative duty to disclose their counsel's belief because a seller has a "duty to disclose in connection with a land sale of residential property when 'justice, equity, and fair dealing demand it.'" See Weintraub v. Krobatsch, 64 N.J. 445, 452 (1974). However, plaintiffs'

reliance on <u>Weintraub</u>, and also <u>Strawn v. Canuso</u>, 140 N.J. 43, 59 (1995), is misplaced because those cases address a seller's obligation to disclose conditions existing on the property to be sold or on nearby properties. Here, there is no claim the Trust did not fully disclose the known conditions on the property and the evidence establishes plaintiffs had the same information pertinent to the contamination on the property as the Trust at the time the parties entered into the agreement.

For those reasons, we are convinced plaintiffs failed to present evidence the Trust misrepresented any material facts, failed to disclose any material facts, or that plaintiffs reasonably relied on any purported misstatement or omission of material facts in deciding to enter into the agreement. We therefore affirm the March 11, 2019 order granting defendants summary judgment on their fraudulent inducement claim.

V.

Plaintiffs also challenge the court's order finding they may not seek damages based on the alleged diminution of the value of the property resulting from the placement of the CEA designation and anticipated implementation of MNA. The court granted the relief based on its determination defendants did not breach the agreement or their covenant of good faith and fair dealing and,

51

for that reason, plaintiffs could not recover damages based on defendants' implementation of remediation efforts—including the CEA and MNA—the court found the parties agreed were acceptable under the agreement.

We agree with the motion court that plaintiffs are not entitled to damages—including damages based on the diminution of the value of the property—resulting from actions taken by defendants in accordance with the agreement. Indeed, "[c]ompensatory damages are designed 'to put the injured party in as good a position as he would have had if performance had been rendered as promised,'" Donovan v. Bachstadt, 91 N.J. 434, 444 (1982) (quoting 525 Main St. Corp. v. Eagle Roofing Co., 34 N.J. 251, 254 (1961)), and there can be no proper award of damages where a party does not breach a legal duty to another.

However, as the motion court correctly explained, plaintiffs are entitled to appropriate compensatory damages in the event defendants breach the agreement. See e.g., Wade v. Kessler Inst., 343 N.J. Super. 338, 352-53 (App. Div. 2001) (explaining compensatory damages are those losses "as may fairly be considered to have arisen naturally from the defendant's breach of contract"). And because we reverse the court's order granting summary judgment on plaintiffs' breach of contract and breach of the covenant of good faith and fair

dealing claims, we also reverse the court's order granting summary judgment on plaintiffs' compensatory damages claim. Plaintiffs shall be entitled to prosecute their claims for compensatory damages without limitation under each of their causes of action in accordance with the evidence presented and the applicable legal principles.

## VI.

Plaintiffs also claim the court erred by granting summary judgment on their punitive damages claim. We find the argument is without sufficient merit to warrant discussion in a written opinion, R. 2:11-3(e)(1)(E) and affirm the summary judgment award on the claim substantially for the reasons detailed by the motion court. We offer only the following brief comments.

Plaintiffs sought punitive damages on their fraudulent inducement claim, but, as we have explained, the court correctly granted defendants' summary judgment on the claim. Additionally, we find no evidence establishing a genuine issue of material fact as to whether defendants' alleged actions "were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by" defendants' alleged acts or omissions, N.J.S.A. 2A:15-5.12(a), within the meaning of the Punitive Damages Act,

N.J.S.A. 2A:15-5.9 to -5.17. See N.J.S.A. 2A:15-5.10 (defining "[a]ctual malice" and "[w]anton and willful disregard" under the Punitive Damages Act).

We further observe that generally punitive damages are inappropriate in breach of contract causes of action, "even where the breach is malicious and unjustified," but there are exceptions to that general principle "where the unusual relationship between the parties reflects a breach of trust beyond the mere breach of a commercial contract." Sandler v. Lawn-A-Mat Chem. & Equip. Corp., 141 N.J. Super. 437, 449 (App. Div. 1976) (quoting McCormick, Law Damages, § 81, 286 (1935)). We find no evidence of such a relationship supporting the exception here. Nor do we find the evidence concerning defendants' pursuit of the CEA designation and MNA as permitted by the LRSP and the NJDEP to address the groundwater contamination, even assuming those actions violated the agreement, constitute "an exceptional and particularly egregious case" entitling plaintiffs to punitive damages on their breach of the covenant of good faith and fair dealing claim. Taddei v. State Farm Indem. Co., 401 N.J. Super. 449, 463 (App. Div. 2008).

VII.

Defendants cross-appeal from the court's order denying their cross-motion for summary judgment based on statute of limitations grounds. They argue the

court erred by failing to find that the six-year statute of limitations, N.J.S.A. 2A:14-1, bars plaintiffs' claims because the agreement required the Trust to obtain a Final RAO by September 8, 2003, the Trust failed to obtain the Final RAO by that date, and plaintiffs did not file suit until 2018.

We find the argument lacks sufficient merit to warrant discussion in a written opinion, R. 2:11-3(e)(1)(E) and affirm substantially for the reasons set forth by the motion court. We note only plaintiffs' claims are not founded on the Trust's failure to obtain a Final RAO by September 8, 2003, and, as we have explained, paragraph 2(a)(6) did not mandate that the groundwater remediation be completed by that date. Rather, in paragraph 2(a)(6), the parties anticipated the groundwater remediation might not be completed by that date.

Plaintiffs' claims are founded on alleged breaches of the agreement and the covenant of good faith and fair dealing in 2016, and thereafter, when defendants for the first time abandoned active remediation methodologies and opted to employ a methodology the plaintiffs asserted violated defendants' ongoing alleged duty to promptly, expeditiously, actively and without delay obtain a Final RAO and sought the CEA without plaintiffs' consent. Thus, plaintiffs' claims first accrued in 2016, and their complaint was timely filed in 2018.

Affirmed in part, reversed in part, and remanded for further proceedings.

We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2242-20